*In re* DE HAAN'S ESTATE.

1. ESTATES OF DECEDENTS — EXECUTORS AND ADMINISTRATORS — CLAIMS FOR SERVICES—PARENT AND CHILD.

On appeal from the commissioners on claims, the circuit court, not having original jurisdiction, cannot permit a claimant to amend his claim so as to present matters which the commissioners did not pass upon.

2. CONTRACTS — QUASI CONTRACTS — EXPRESS AGREEMENT PRE-
   CLUDING IMPLIED.

   No contract can be implied between parties who have ex-
   pressed an agreement on the same matter.

3. SAME—PARENT AND CHILD—ESTATES OF DECEDENTS.

   Evidence that decedent got his son to move on his farm and
   care for decedent, work the farm and share in the proceeds,
   that an agreement was made between them to give the son
   two-thirds and the father the rest of the crops, the son to
   have the use of his father's horse and cow, that the father
   had said to several witnesses that he was going to make it
   right with the son, and he did in fact devise the homestead
   to the son and his family by his last will, has no tendency to
   establish an implied contract to pay the son for the care of
   the deceased.

4. SAME—PRESUMPTIONS.

   It is presumed that services rendered by a son in caring for the
   father and for property owned by him, while all were living
   together as a family were gratuitously performed.

Error to Ottawa; Padgham, J.    Submitted January 26,
1911.    (Docket No. 65.)    Decided March 12, 1912.

Arend Branderhorst, administrator of the estate of
Peter De Haan, deceased, presented a claim against the
estate of Geert De Haan, deceased, for board and services
rendered.    From the allowance of the claim, the defend-
ant estate appealed to the circuit court.    Judgment for
defendant upon a directed verdict.    Claimant brings
error.    Affirmed.

*Jarrett N. Clark* and *George A. Farr*, for appellant.

*Diekema & Kollen* (*Wilkes & Hoffman*, of counsel),
for appellee.

STEERE, J.    Geert De Haan and Peter De Haan were
father and son.    They had lived together on Geert's farm
for many years.    Peter, who had a family, worked the
farm on shares, and Geert, who was a widower, boarded
with him.    Peter, the son, died on May 7, 1909, and
Geert, the father, died on June 6, 1909.    While their

estates were being administered, Arend Branderhorst, administrator of the estate of Peter, presented on December 4, 1909, to the commissioners on claims in Geert's estate, a bill, amounting to $2,094, for board, care, and attendance of Geert during a period of 958 weeks, based on an implied contract to pay for the same. This bill was allowed by the commissioners, and an appeal was taken in behalf of the defendant estate to the circuit court of Ottawa county, where the case was tried before a jury and a verdict rendered for defendant by order of the court.

It was the opinion of the circuit judge that the testimony did not tend to establish an implied contract as claimed, but did show an express contract covering the matter, which contract had been performed, excepting a possible claim which Peter might have had against Geert for the use of a cow and a horse during a portion of the time they lived together. Touching this possible claim, the court proposed to counsel for claimant that he might amend the pleadings, if he wished, and make proof of values; whereupon that question would be submitted to the jury. Counsel claimed the right to go to the jury on the question of an implied contract for the full amount, and disavowed any desire to try the smaller issue, saying to the court:

"I do not think we care to go to the jury on the question of the value of the use of the cow for six years, and I don't care to make the amendment suggested."

Under this statement, and in the absence of any proof as to value of the items which the court suggested might be proper for a jury to pass on, a verdict was directed as stated.

The items for the use of a cow and horse during a portion of the time the parties lived together were never presented to the commissioners in the probate court. The circuit court had no original jurisdiction in the matter, and no new claims could be considered there. For that reason, as well as the absence of proof of value, the court

properly directed the verdict in that particular. *Patrick* v. *Howard*, 47 Mich. 40 (10 N. W. 71); *Kroll* v. *Ten Eyck's Estate*, 48 Mich. 230 (12 N. W. 164); *Luizzi* v. *Brady's Estate*, 140 Mich. 73 (103 N. W. 574).

It is elementary that there can be no implied contract in relation to a particular matter where the parties have made an express contract on the same subject. It therefore remains to determine whether there is any testimony which warranted the claim that there was an implied promise on the part of the father to pay the son the amount contended for, or any part of it.

The facts do not appear to be in dispute. Nine witnesses were sworn; much of their testimony cannot be claimed to touch on the important questions involved. In 1890, when he was about 60 years of age, Geert De Haan was living on his farm of 80 acres, in Zeeland township, alone with his youngest son, a boy 16 years old, working the farm and keeping house as best they could. Geert's wife was dead and the rest of the family away. Geert found this unsatisfactory and desired to change, either to live with some of his older children, or have them come and live with him. He finally secured his son Peter, who lived on a small mortgaged farm in Allendale and was owing his father, to join him. Peter moved with his family to his father's farm, bringing a horse and some farming tools with him. He had a numerous family. His oldest child was then eight years of age. When he died, he had nine children.

The father had two rooms in one part of the house, with his own furniture in them, and boarded in Peter's family. Peter ran the farm, getting two-thirds of the crops. The father worked on the farm at times as he felt disposed, and kept a horse, which he used at pleasure, feeding it from his share of the crops. They continued to so live there together, apparently contented and in harmony, until they died. The testimony shows quite clearly that when Peter returned to his father's farm they had a definite under-

standing and express contract as to the terms on which they should live together and the farm be worked.

Arend Branderhorst, the administrator of Peter's estate, who presented and is urging this claim, testified:

"Peter came to the farm in the fall of 1890. When Peter came to the old gentleman's farm, the old gentleman had a horse and cow. I could not say if he had more than one cow, but I recollect he had one cow that Peter should have the use of. I don't know how long the old gentleman kept the horse; but Peter told me he sold that cow when she was three weeks fresh. When Peter was telling me this, the old gentleman and Peter were both present; but I could not say if the old gentleman heard Peter say that. * * *

"*Q.* You have had a talk with the old man before the time Peter came there about the arrangements of Peter's coming?

"*A.* Yes, sir. * * * He said Peter took the farm. He got one-third; Peter two-thirds.

"*Q.* Is that all?

"*A.* Then Peter said he had to have the horse and cow.

"*Q.* Who had the horse and cow?

"*A.* He was going to have the horse and cow.

"*Q.* For what?

"*A.* For the board.

"*Q.* For the old man's board?

"*A.* Yes, sir.

"*Q.* That was the arrangement they made when the old man went there, was it? that is, the arrangement they made at Allendale?

"*A.* Yes, sir. * * *

"*Q.* Who told you that?

"*A.* Peter told me, I just said.

"*Q.* And the old man, too?

"*A.* The old man said Peter was going to have two-thirds, and he was going to have one-third, and then Peter said he was going to have the use of the horse and cow. * * * When the old man told me Peter was going to have that, then Peter said he was going to have the horse and cow, too—the use of the horse and cow.

"*Q.* For the board of the old man?

"*A.* Yes. * * * When Peter moved to the old man's farm, the old man had a horse. He still had the horse when Peter died. This was not the same horse.

\* \* \* He traded horses once in a while. Peter had two horses. When he used three horses, he used the old gentleman's horse. \* \* \* They used him some on the cultivator and on the binder for the third horse, when they used a third horse. \* \* \* ˙ The old gentleman fed his horse out of his own share of the feed. After the old man sold the cow, he never had a cow after that. Peter had generally four cows, which he pastured on the place. Peter had all the milk and butter, except such as the old man needed for his own use. He pastured his cows there during the time he lived there, and some young stock."

There is no other evidence of any statements or claims made by Peter, or statements by the father to Peter or in his presence. The other testimony relates mostly to friendly relations of the parties and statements made to neighbors by the father, expressing satisfaction with his treatment, and declarations of intention to compensate Peter and his family for their kindness to him by giving them a gratuitous preference on his decease.

We find no proof in the case of any direct promise made by the father to pay for "care and attendance," or of any statement by him to others that he had made an agreement of that nature. In various conversations with his neighbors, in which he was expressing satisfaction with the manner Peter and his family had treated him, he used expressions from which it is claimed a bargain can be inferred. The strongest of such expressions are: "He had lived comfortably with Peter and was going to make it right with Peter;" "that he would make it good for Peter;" that "Peter and his family had taken care of him and he wanted to compensate them for it;" and in a conversation with a witness named Lenters, while expressing satisfaction over Peter returning to live with him, he said, "Of course, he gets the 40 acres, the homestead, for my keep." His intention in that particular appears to have been carried out in his last will. The will is not set out in the record; but from the testimony of the man who drew it, who seems to have referred to the will when he was testifying,

Geert left the homestead to Peter and his wife for life, with remainder to their children. This witness testifies that he drew four different wills for the old gentleman, in some of which he left the homestead to Peter, and in some of which he did not. He had numerous lengthy conversations with Geert on the subject, and testifies to various statements by him to the effect that he desired to provide compensation for Peter and his family in return for their kindness to him. He also testifies in that connection:

" He said he never made a particular bargain, only that he wanted Peter and Peter's family to have a certain amount of his property; that he would make it good with him if he took care of him."

Peter died before his father, and Peter's family got the 40-acre homestead.

There is not a word in the record showing that Peter or his family at any time claimed or expected to be compensated for extra services rendered. There is little to indicate that he was given or required any special care and attention beyond that reasonably implied in case of an ordinary boarder. Geert was living in his own house, in rooms furnished by himself. He is not shown to have been sickly or helpless or in need of extra care. It is testified that even during the last few years of his life he was not sickly, though he was troubled with rheumatism by spells, and old age was coming on. There is no testimony as to the duration or nature of his last illness, and there is an absence of any testimony from which the value of the alleged services might be ascertained.

The presumption is that services of the nature claimed, rendered in the family to a relative, are gratuitous. There is not enough in this record to overcome the presumption of relationship. There is uncontroverted proof of an express contract for board. To establish this claim of an implied contract for extra care and attendance, the service must be proven, and there must be testimony tending to show an agreement, assented to by both parties, binding in law and requiring compensation. The import

of the testimony relied on is gratuitous expressions of intention to compensate Peter and his family for this kindness during the years the father lived with them. This case is within the rules announced in *Decker* v. *Kanous' Estate*, 129 Mich. 146 (88 N. W. 398); *Luizzi* v. *Brady's Estate*, 140 Mich. 70 (103 N. W. 574); *In re Colburn's Estate*, 153 Mich. 206 (116 N. W. 986, 126 Am. St. Rep. 479), and cases there cited.

The judgment is affirmed.

MOORE, C. J., and MCALVAY, BROOKE, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.