## EARP v. CITY OF DETROIT

1. PRIVACY, RIGHT OF—WAIVER—SUMMARY JUDGMENT.
   Summary judgment in favor of defendant employer in action for invasion of privacy *held*, proper, where a copy of a police interview given to defendant-employer, in which plaintiff-employee admitted changing records and accepting money tips contrary to company policy, was not of a private nature and was not made public, and where plaintiff had waived his right of privacy by disclosing to his employer that he had been interviewed by the police in connection with wiretapping.

2. CONSPIRACY—ELEMENTS OF CAUSE OF ACTION.
   Civil action for conspiracy alone does not exist; the conspiracy must be coupled with the commission of acts which damage the plaintiff.

3. TORTS—CONSPIRACY—ELEMENTS OF CAUSE OF ACTION.
   Recovery may be had from defendants on the theory of concerted action as long as the elements of the separate and actionable tort are properly proved.

REFERENCES FOR POINTS IN HEADNOTES
[1] 41 Am Jur, Privacy §§ 17–19.
  Right of privacy. 14 ALR2d 750.
[2, 3, 7–12] 16 Am Jur 2d, Conspiracy § 7 *et seq.*
[4] 41 Am Jur, Privacy § 2.
[5] 41 Am Jur, Privacy § 14.
[6] 41 Am Jur, Privacy § 20 *et seq.*

4. Privacy, Right of—Definition—Torts.

The right of privacy is defined as the right of an individual to be let alone, or to live a life of seclusion, or to be free from unwarranted publicity, or to live without unwarranted interference by the public about matters with which the public is not necessarily concerned, or to be protected from any wrongful intrusion into an individual's private life which would outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

5. Privacy, Right of—Business Relations—Public Interest.

The right of privacy does not extend so far as to subvert those rights which spring from social conditions, including business relations, or prohibit the publication of matter which is of public or general interest or benefit.

6. Privacy, Right of—Forms of Invasion.

Intrusion, disclosure, false light, and appropriation are four forms of invasion of privacy.

7. Privacy, Right of—Intrusion—Disclosure—False Light—Appropriation.

Intrusion and disclosure as violations of the right of privacy require the invasion of something secret, secluded or private pertaining to the plaintiff; false light and appropriation do not.

8. Privacy, Right of—Disclosure—False Light—Intrusion—Appropriation.

Disclosure and false light as violations of the right of privacy depend on publicity; intrusion and appropriation do not.

9. Privacy, Right of—Intrusion.

Intrusion, to be an actionable invasion of privacy, must be something which is objectionable to a reasonable man, and the thing to which there is intrusion or prying must be private.

10. Privacy, Right of—Invasion—Question of Fact.

Every controversy on invasion of privacy must necessarily turn upon its own peculiar facts.

11. Privacy, Right of—Torts—Curtain of Privacy.

Invasion of privacy depends not upon conduct otherwise tortious nor does it turn upon breach of confidence, or truth or untruths, or an arithmetical measure of the numbers who witnessed the exposure, or the particular method thereof, whether by placard or by letter; the wrong is done when the curtain of privacy is lifted.

12. PRIVACY, RIGHT OF—EMPLOYER—EMPLOYEE—CRIMINAL ACTIV
ITIES—INVESTIGATION.

   Defendant-employer had a right to request a copy of an interview between the police and plaintiff-employee, where defendant had arranged the interview which involved the investigation of criminal activities making use of defendant's telephone
   equipment; therefore his request was not an invasion of plaintiff's privacy.

   Appeal from Wayne, George E. Bowles, J.   Submitted Division 1 January 14, 1969, at Detroit.
(Docket No. 5,936.)   Decided February 27, 1969.

   Complaint by Richard M. Earp against the City
of Detroit and Michigan Bell Telephone Company
for damages for invasion of privacy.   Summary
judgment for defendant Michigan Bell Telephone
Company.   Plaintiff appeals.   Affirmed.

   *Kelly, Greenstein & McCann,* for plaintiff.

   *Butzel, Eaman, Long, Gust & Kennedy (A. H.
Williams* and *John L. Vanker,* of counsel), and *Alan
R. Waterstone,* for defendant Michigan Bell Telephone Company.

   BEFORE: FITZGERALD, P. J., and R. B. BURNS
and BRONSON, JJ.

   BRONSON, J.   On July 16, 1963, plaintiff Richard
Earp, a telephone installer employed by Michigan
Bell Telephone Company, was interviewed by two
detectives from the Criminal Intelligence Bureau of
the City of Detroit Police Department.   The interview was arranged by Michigan Bell and was in
connection with an investigation being conducted by
the police and Michigan Bell into alleged wiretapping operations.   The interview took place at the

Michigan Bell garage on St. Jean street in Detroit. When Earp requested the presence of either a Bell foreman or a union representative he was told that the interview was police business[1] and had nothing to do with the telephone company or the union. Earp was further assured that any information he gave would be held in confidential report. The detectives were interested in obtaining any knowledge that Earp might have concerning a certain suspect who was a key figure in the investigation. During this interview Earp not only told of having installed phones on several occasions, he further stated that he had changed records and accepted "money tips" for so doing (these latter contrary to company policy).

Immediately after the interview Earp went to see his supervisor Edwin Beck. Although there is some discrepancy as to the extent of their conversation (see *infra*), it is clear that Earp told Beck that he had just had an interview with two police detectives, and that Beck told Earp that he would look into it and get back to Earp. On July 19, 1963, plaintiff was interviewed by Albert Langtry, staff supervisor

---

[1] See transcript, motion for summary judgment, civil action #46061, January 12, 1967, pp 53–54.

"*A.* Well, I went in the office there and the two policemen were sitting at the table and they sat there and they didn't say anything for a minute and then I—I says, 'Well, what's up?'

"And they says, 'Well, don't you know?'

"I says, 'No.'

"And then he asked me if I knew Curtis Chandler and I said no, I didn't know him personally. So they go into asking me questions and I says, 'Well,' I says, 'I'd like to have a telephone foreman or a union representative in here with me to represent me.'

"They says, no, this is police business, has nothing to do with the telephone company or the union and anything you tell us will be held in confidential report to the Detroit Police Department.

"*Q.* Okay.

"Now, after you had been told this did you ever get your union steward in there with you?

"*A.* No, they refused to let me call him or to call in the foreman, either."

in the special audit district of Michigan Bell. Mr. Beck was also present. At this meeting a copy of the confidential police report was shown to Earp. Plaintiff was then asked if the statements in the report were true and several corrections were made. Earp then "voluntarily" signed a statement consisting of notes taken by Beck during the interview. The statement, in essence, admitted that Earp had had some involvement with an alleged bookie and had received "money tips" from him.

Following the interview on July 19, 1963, Earp was suspended, and this suspension became permanent shortly thereafter.

Plaintiff unsuccessfully resorted to the grievance procedure under the union contract. He then filed this civil action. The gist of the action is that Michigan Bell Telephone Company illegally conspired with the police department to obtain confidential information given to the police by Earp, the giving and solicitation of which amounted to invasion of the right of privacy of appellant. From a partial summary judgment in favor of Michigan Bell of no cause of action granted in Wayne county circuit court, plaintiff Richard M. Earp appeals.

There is no civil action for conspiracy alone. *Roche* v. *Blair* (1943), 305 Mich 608. It must be coupled with the commission of acts which damaged the plaintiff. Recovery may be had from parties on the theory of concerted action as long as the elements of the separate and actionable tort are properly proved. *Scofield* v. *Clarke* (1914), 179 Mich 681. Thus, the outcome of this appeal rests upon a determination of whether or not the plaintiff stated a cause of action for the alleged invasion of privacy.

The right of privacy is defined as:

"[T]he right of an individual to be let alone, or to live a life of seclusion, or to be free from unwar-

ranted publicity, or to live without unwarranted interference by the public about matters with which the public is not necessarily concerned, or to be protected from any wrongful intrusion into an individual's private life which would outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." 77 CJS, Right of Privacy, § 1, pp 396, 397.

However, this right is not absolute.

"In determining the extent of the right of privacy, it is essential to consider it in the light of duties imposed on individuals as citizens of a free country and in the light of an individual's relation to the community of which he is a member, and such right does not extend so far as to subvert those rights which spring from social conditions, including business relations, or to prohibit the publication of matter which is of public or general interest or benefit." 77 CJS, Right of Privacy, § 3, pp 401, 402.

Dean Prosser cites four forms of invasion of privacy—intrusion, disclosure, false light, and appropriation. The first two "require the invasion of something secret, secluded or private pertaining to the plaintiff; the third and fourth do not". However, while disclosure and false light depend on publicity, intrusion and appropriation do not.[2] Of the four distinct forms of the tort, it seems that appellant is asserting either an "intrusion" upon his privacy, which was committed when Michigan Bell sought out information concerning the appellant, or "disclosure" of confidential information to a source not authorized by the appellant. In order for the "intrusion" to be actionable it must be something which is objectionable to a reasonable man,[3] and the

---

[2] Prosser, Torts (3d ed), § 112, p 843.

[3] "Liability [for seriously interfering with another's interest in not having his affairs known to others] exists only if the defendant's conduct was such that he should have realized that it would offend per-

thing into which there is intrusion or prying must be private. Prosser, Torts (3d ed), § 112, p 833. If the charge is that there was "disclosure", the disclosure must be made public, not private, and involve publicity. Prosser, Torts (3d ed), § 112, p 835.

Although there is a duty of the defendant to refrain from prying or intruding into plaintiff's private affairs, this duty is not absolute. (See *supra,* 77 CJS, Right of Privacy, § 3, p 401.) In accord with the finding in *Gill* v. *Curtis Pub. Co.* (Cal App, 1951), 231 P2d 565, 568, that "every controversy [on invasion of privacy] must necessarily turn upon its own peculiar facts", we must very carefully examine the facts here present.

(1) Detroit Police contacted Langtry (Michigan Bell) to investigate alleged wiretapping,[4]

(2) Langtry informed Beck,

(3) Beck arranged the interview with Earp,

(4) Earp notified Beck of his concern after the interview,

(5) Beck notified Langtry,

(6) Langtry met with Earp, at which time he had a copy of the "confidential" police report.

There is some discrepancy as to what actually transpired when Earp went to Beck's office on July 16. Earp claims that he told Beck of the interview and asked why he was singled out by the police. Beck claims that Earp discussed the details of the

_____

sons of ordinary sensibilities. Restatement, Torts, § 867, d." *Gill* v. *Curtis Pub. Co.* (Cal App, 1951), 231 P2d 565, 567.

[4] In testimony taken on the motion for summary judgment, civil action #46061, January 12, 1967, upon which this appeal is based, Mr. Albert C. Langtry, an employee of Michigan Bell, testified at p 28:

"Michigan Bell Telephone Company had been contacted by the Detroit Police Department to assist in the investigation of a wiretap complaint located at 4150 Wayburn in the city of Detroit. Our original call from the Detroit police was at 8:00 a. m. on June 26, 1963, and we checked out— *the purpose of calling Michigan Bell Telephone Company, we're the only ones that could check out the wiretap to see whose line was being tapped.* * * *" (Emphasis added.)

interview including the admission by Earp of having accepted "money tips". Whichever testimony is accepted, it is clear that by July 16 Earp had disclosed to Michigan Bell that he had been interviewed by the Detroit Police Department (at the very least, in connection with alleged wiretapping).[5] Earp testified that when he went to Beck to find out why he had been interviewed, Beck replied, "[I]f I can find anything out for you, I'll get it back to you."

Without reflecting on the duty owed to Earp by the Detroit Police Department, which is beyond the scope of this opinion, it is necessary to evaluate what obligation Michigan Bell had not to seek out or receive information from the police. Upon the record we can find no testimony that establishes just how a copy of the "confidential" report was obtained by Langtry. It is not clear whether there was an offer by the police department or an active searching out by Michigan Bell. It is a matter of fact to be ascertained whether the police were constructively notified of any waiver by Earp to Michigan Bell (indeed it is doubtful that Earp would want the police to divulge information to Bell that he had broken company rules). However, as to Bell there was knowledge of the interview.[6] Fur-

---

[5] "The right of privacy may be waived by the individual or by anyone authorized by him, and this waiver may be either express or implied. The right may be lost by a course of conduct which estops its assertion. * * * The existence of a waiver carries with it the right to an invasion of privacy only to such an extent, however, as may be legitimately necessary and proper in dealing with the matter which has brought about the waiver, or, as otherwise stated, only to the extent warranted by the circumstances which brought about the waiver.

"There can never be a waiver of the right of privacy, in the absence of knowledge and consent of the person entitled to waive." 77 CJS, Right of Privacy, § 6, pp 413, 414.

[6] Since they deal with the role between informers and the government, a look at *Roviaro v. United States* (1957), 353 US 53 (77 S Ct 623, 1 L Ed 2d 639), and *Westinghouse Electric Corp. v. City of Burlington, Vermont* (1965), 122 App DC 65 (351 F2d 762), might prove helpful. In *Roviaro* the court stated at 59, 60:

ther, Earp's conversation with Beck sufficiently apprised Michigan Bell so as to warrant further investigation into the matter.[7]  In *Hawley* v. *Credit*

"What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.  [Cases cited.]  The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

"The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged.  Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable."

In *Westinghouse*, the court stated at 351 F2d 768:

"The significance of the *Roviaro* decision goes beyond the specific context in which it arose.  The approach taken in the *Vogel* and *Arnstein* cases is virtually abandoned.  *Roviaro* establishes several points: (1) Only the identity of the informer is privileged.  The content of the communication is not privileged unless it would tend to reveal the identity of the informer.  And once the identity is revealed, the privilege terminates.  (2) Although the matter was not explicitly decided, it would seem from this opinion that an informer can waive the privilege.  Once he identifies himself as an informer the privilege disappears."

It must also be noted, however, that as to the government's privilege the court went on to say at 768:

"It is difficult to see how the Government could prevent him from revealing himself, practically or theoretically, or why, as a matter of policy, it would want to do so.  The court notes that the 'informer's privilege is in reality the Government's privilege.'  353 US at 59 (77 S Ct at 627, 1 L Ed 2d at 644).  Whatever the reality referred to is, this statement can scarcely mean that only the Government can waive the privilege; we read it as meaning that the privilege exists for the benefit of the general public, not for the benefit of the particular informer involved.  It would not follow from this that the informer cannot voluntarily waive the privilege."

[7] In *McDaniel* v. *Atlanta Coca-Cola Bottling Co.* (1939), 60 Ga App 92, 100 (2 SE2d 810), the court states, quoting *Pavesich* v. *New England Life Insurance Co.*, 122 Ga 190 (50 SE 68, 69 LRA 101):

"It was also held: '8. The right of privacy may be waived, either expressly or by implication, except as to those matters which law or public policy demands shall be kept private; but a waiver authorizes an invasion of the right only to such an extent as is necessarily to be inferred from the purpose for which the waiver is made.  A waiver for one purpose and in favor of one person or class does not authorize an invasion for all purposes or by all persons and classes.'  In the opinion it was said: 'The right of privacy has its foundation in the instincts of nature.  It is recognized intuitively, consciousness being

*Bureau, Inc.* (1956), 345 Mich 500, a letter was sent by defendant to plaintiff's employer notifying him of plaintiff's nonpayment of a debt. In *Hawley* the Supreme Court reversed the judgment for plaintiff. While dissenting from the outcome, TALBOT SMITH, J., acknowledges that there is not a freefloating tortious act in invasion of privacy.

"* * * The wrong depends not upon conduct otherwise tortious (*i.e.,* trespass, defamation) nor does it turn upon breach of confidence, or truth or untruths, or an arithmetical measure of the numbers who witnessed the exposure, or the particular method thereof, whether by placard (*Brents* v. *Morgan, supra*) or by letter (*LaSalle Extension University* v. *Fogarty, supra*). The wrong is done when the curtain of privacy is lifted." *Hawley* v. *Credit Bureau, Inc., supra,* at 514.

Thus, when Earp discussed the interview with Beck, in effect he helped to lift the curtain of privacy.

Plaintiff contends that the statement he signed at the close of his meeting with Langtry was not a waiver since it was apparent that Michigan Bell was already in receipt of the police report. This cannot be supported. First, there was the admission on July 16 to Beck. Second, there was the duty of Michigan Bell as Earp's employer to investigate the possibility that one of its employees had engaged in extra-legal activities utilizing its equipment. That no warrant was issued against Earp had nothing to do with Michigan Bell's investigation.[8] Earp did

---

the witness that can be called to establish its existence. Any person whose intellect is in a normal condition recognizes at once that as to each individual member of society there are matters private and there are matters public so far as the individual is concerned.' "

[8] " 'Personal liberty includes not only freedom from physical restraint, but also the right "to be let alone," to determine one's mode of life, whether it shall be a life of publicity or of privacy, and to order one's life and manage one's affairs in a manner that may be most agreeable to him, *so long as he does not violate the rights*

not have to tell of the "tips" he had received when questioned by the police since that was beyond the scope of the investigation.  If there were other acts against company policy reported in the police report which were divulged, that is a matter between Earp and the police.  Michigan Bell had the right to look into what it had been made aware was the possibility of illegal conduct by an employee.  That it turned out to be not illegal but merely contrary to company rules does not invalidate the inquiry.  Nor does it taint in any way the information received.  Michigan Bell had a right to request a copy of the interview between the police and one of its employees which: (1) was arranged by Michigan Bell, and (2) involved an investigation of criminal activities (which Bell was aware of since it had been so informed by the police—see *supra*).

Plaintiff cites *Pallas* v. *Crowley, Milner & Company* (1948), 322 Mich 411, as supporting the finding of an invasion of privacy against Michigan Bell. In *Pallas* the defendant utilized a photograph of plaintiff in a published newspaper advertisement for a retail store defendant owned.  The photograph had been consented to by plaintiff in connection with her theatrical career.  In the present action there was not a publication of the facts found by Michigan Bell.

The information given Bell was not of a private nature.  Clearly it was not something one would want to get around but it concerned a matter of public interest.  In addition it was not made public or publicized.  It was given to Earp's employer and had to do directly with matters of his employment and the use of employer's facilities.  Bell had a duty to know if their equipment was being used for

---

*of others or of the public.' " McDaniel v. Atlanta Coca-Cola Bottling Co., supra,* at 100 quoting *Pavesich v. New England Life Insurance Co.,* 122 Ga 190 (50 SE 68, 69 LRA 101).  (Emphasis added.)

criminal activities, to investigate such use and stop it.

In *Hawley* v. *Credit Bureau, Inc., supra,* 507, the Court said:

"* * * [H]ence, the question of law for us to determine is, was the nonpayment by plaintiff a matter of such nature that he was entitled by law to require all people that knew of it to say nothing about it? The writing of the letter sued on as libelous was the invasion of no right of privacy of plaintiff. Defendants gave no unnecessary publicity to plaintiff's conduct."

Here the confidential information that Earp gave to the police was not of such a nature that he was entitled by law to require all who knew of it to say nothing. Any question of the police department's right to release such information, subject to their rules and promises, notwithstanding, it would seem that it would be their duty to inform Bell that their facilities were being used for illegal purposes.

We find that Michigan Bell was acting within its valid scope of authority as an employer.

There was valid waiver. Thus, we find no genuine issue as to this material fact, and no cause of action against Michigan Bell. *Durant* v. *Stahlin, appeal in re Van Dusen, Elliott, Romney* (1965), 375 Mich 628; *Tripp* v. *Dziwanoski* (1965), 375 Mich 619. In so finding, we affirm the lower court's decision on summary judgment as to defendant Michigan Bell Telephone Company.

Affirmed.

All concurred.