Ralph BAGGS, Vern Baggs, Jr., Thomas A. Brown, Gary A. Delecki, Bill Elya III, Lori J. Glick, Merrill J. Hansen, Tracy Helsel, Robert Kanaziz, Anthony F. Krol, Garry Moore, Timothy Morrison, Deane W. Pahl, Penny J. Pahl, Gary Parker, Gary Roessler, Mark Russell, David Wilson, Mark Birgy, Daniel Cummer, Mary Ann Fender, Walter Montney, Michael Mooring, Patricia Russell, Daniel Schelske, Barbara Schirripa, Nadine Wells, James D. Wilson, II, James MacDonald, and persons similarly situated, Plaintiffs,

v.

EAGLE–PICHER INDUSTRIES, INC., an Ohio corporation, Defendant.

File No. G89–50911–CA.

United States District Court, W.D. Michigan, S.D.

July 30, 1990.

Craig W. Elhart, Elhart and Power, Traverse City, Mich., for plaintiffs.

Jon G. March, Miller, Johnson, Snell and Cummiskey, Grand Rapids, Mich., for defendant.

## OPINION OF THE COURT

ROBERT HOLMES BELL, District Judge.

Now before the Court is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) (Rule 56) as to Counts I, II, IV, VI and portions of Count III of plaintiffs' third amended complaint. Also before the Court is defendant's motion for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) [Rule 12(b)(6) ] as to the remainder of Count III and all of Count V of plaintiffs' third amended complaint.

## BACKGROUND

This case arises out of surprise drug test conducted by defendant in August 1989. Defendant is an Ohio corporation with a division located in Kalkaska, Michigan. The Kalkaska plant is defendant's Trim Division which makes parts such as headliners and door panels for the automotive industry. Employees at defendant's plant work in teams in the assembly process. Some of the activities conducted by the teams are potentially hazardous such as hydraulic and electronic presses, forklifts and hot glue and adhesive.

Defendant employs approximately 230 people at its Kalkaska plant. Each of the employees signed an application form in which the language varied slightly depending on the year of application. However, each of the applications contained one of the paragraphs below:

I understand and agree that if employed, the employment relationship can be terminated at will without notice or cause by either party, notwithstanding any other oral or written statements by the company prior to, at or following the date of employment, unless set out in writing, dated, and executed by both parties.

or

I also understand and agree that, if hired, my employment is for no definite period and may, regardless of the date of payment of my wages, be terminated for any reason or no reason at any time at the sole discretion of the company without prior notice.

or

I understand and agree that, if hired, my employment is for no definite period and may, regardless of the date of payment of my wages and salary, be terminated at any time without any prior notice.

The employee handbook given to each employee states:

This handbook, with its rules and regulations, is not to be considered as generating terms and conditions of an employee contract. You have the right to terminate your employment at any time without notice and without cause, and the company maintains the same right.

The employee handbook also contains a progressive discipline section which sets forth four basic disciplinary steps. There is first a verbal warning, followed by a written warning, a final warning and discharge. The disciplinary section also states:

These 3 steps may not always be followed. It depends on how serious or negligent the initial offense is. If a serious offense takes place, discharge may result without any of the other warnings taking place.

If any employee receives disciplinary action which they feel is unfair, management will have an open ear and listen to your complaint. A discussion of all the facts should reveal the most fair decision. The most important point that should be made when disciplinary action occurs is that it is done in the most fair and equitable manner possible.

In 1988 and 1989, defendant's management became aware of a drug problem at its Kalkaska plant. Defendant became aware of the problem through employee complaints, truck drivers making deliveries and a building contractor doing work at the plant. In response to this information, defendant posted a drug free workplace policy in April 1989. This policy prohibited employees from possessing, using or being under the influence of drugs while at work and provided that employees could be tested for drug use. Defendant also required all new applicants to submit to drug testing as a prerequisite to being hired.

In April 1989, defendant consulted with the Grand Traverse Narcotics Team and the Kalkaska County Sheriff and placed an undercover officer in the plant as an employee. The officer arrested two employees for selling drugs. For emphasis, defendant agreed to have the employees arrested at the plant. It is unclear from the pleadings whether these employees were arrested for selling drugs at the plant or at some other place. After the undercover officer finished his undercover work, he reported to defendant's management that he esti-

mated that as many as 60% of defendant's employees used drugs at home, at work or both. Several of the plaintiffs have admitted that people were using drugs at work.

On July 17, 1989 a new drug free workplace policy was posted. That policy stated:

It is the policy of this Company to provide a workplace free of alcohol and drugs, and to ensure that employee alcohol or drug use does not jeopardize the success of its operations, or otherwise affect the Company, its employees or its customers.

The use, sale, attempted sale, manufacture, purchase, attempted purchase, possession or transfer of alcohol or an illegal drug while on Company property or reported to work with alcohol, illegal or illicit drugs in the employee's system is a violation of Company rules and will result in disciplinary action, up to and including discharge.

Employees who believe or have been informed that their use of a drug (prescribed or over-the-counter) may present a safety risk, are to report the use of such drug to their supervisor before starting to work to ensure safety of themselves, other employees and Company property.

Employees who believe they have an alcohol or drug abuse problem can seek voluntary assistance through the personnel department. It is the employee's responsibility to seek help before the employee's alcohol or drug problems lead to disciplinary action, up to and including discharge. The Company will assure strict confidentiality to each employee who seeks assistance, and will assist each employee in obtaining the needed help through the Company's group medical benefits.

While the Company believes in respecting the rights of employees, it is also concerned about the safety, job security and job performance problems created on the job through the use of drugs and alcohol by employees.

In order to protect the well-being of our employees, our facilities and the community in which we live, each employee, as a condition of employment will be required, upon request of Company supervisory personnel, to submit to blood and/or urine tests for determining use of alcohol and/or illegal or illicit drugs.

Employees convicted of criminal drug statute violations, which result from activities occurring on or off Company premises while conducting Company business, must notify the Company within five (5) days of the conviction.

Employees must abide by the terms of this Policy as a condition of continued employment.

This policy was also included in the handbook distributed to the employees on August 7 and 8, 1989.

On August 10 and 11, 1989, defendant announced that it was going to conduct drug testing on those days. Only three people in management knew about the tests ahead of time. The men and women employees were asked to go into the men and women's bathrooms respectively and produce urine samples. There was a nurse present in each bathroom (a male nurse in the men's bathroom and a female nurse in the women's). Employees were told that, if they did not want to take the test, they could leave the plant and they would be considered a voluntary quit. Some employees who are plaintiffs in this suit did leave and were considered as voluntary quits as of that date. The remaining employees who gave samples signed consent forms and initialed chain of custody forms. Employees who were tested later were tested at a local health clinic. The samples were sent to SmithKline Bio–Science Laboratories in St. Louis, Missouri for testing. The testing for marijuana was set at a level to register a negative for anyone who had been exposed to passive inhalation of the substance. All positive results were confirmed by gas chromatograph/mass spectrometry which defendant believes is the same testing format used by the National Football League. A number of the plaintiffs tested positive for marijuana, one tested positive for cocaine and one for propoxyphene. Plaintiff Daniel Schelske was retested because of contamination and his

second test was positive. Plaintiff Daniel Cummer tested negative. However, on August 16, 1989, he refused to work assignment, walked off the job and was considered a voluntary quit.

Following the drug testing, the news media were informed by one of the plaintiffs that it had occurred. As a result, the media contacted Michael Aslanian, defendant's vice president, for comment. Mr. Aslanian confirmed the drug testing. Mr. Aslanian also confirmed that some employees had left rather than take the test and the some employees had been terminated for positive test results. At no time did Mr. Aslanian name any of the employees nor did defendant initiate the media coverage.

Count I of plaintiffs' third amended complaint alleges breach of contract for the failure of defendant to follow the progressive disciplinary stages set forth in the employee handbook in the drug testing and termination of employees. Count II alleges that defendant defamed plaintiffs by indicating or implying to news agencies, the Michigan Department of Labor or others that plaintiffs were drug users. Count III alleges invasion of plaintiffs' right of privacy under the United States and Michigan constitutions. Count III also alleges a cause of action under the common law tort of invasion of privacy in that the test itself was an invasion of privacy as was the breach of confidentiality promised by the defendant's drug free workplace policy. Count III also alleged an invasion of privacy by the publication of the testing, the reasons for testing and the plaintiffs' involvement or lack of involvement in the testing. Count IV alleges defendant's misrepresentation of its policy and plaintiffs' detrimental reliance on this misrepresentation. Count V alleges negligent handling of the situation. Count VI alleges a violation of the Michigan Handicappers' Civil Rights Act. In their brief, plaintiffs restrict their argument to their claims for breach of contract, defamation and invasion of privacy. Plaintiffs apparently abandon their claims of misrepresentation, negligence and violation of the Michigan Handicappers' Civil Rights Act. However, this opinion will briefly discuss those three areas.

## ANALYSIS

Rule 12(b) provides that, if on a Rule 12(b)(6) motion matters outside the pleadings are submitted to the Court and the Court considers them, the Court shall treat the motion as one for summary judgment under Rule 56. Both plaintiffs and defendant have submitted documents outside the pleadings in support of their arguments. The Court has considered those documents and will treat this motion as one for summary judgment.

On a motion for summary judgment, the Court reviews the evidence in a light most favorable to the nonmoving party. The moving party has the burden of showing the Court that "there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). The nonmoving party must present the Court with specific facts which demonstrate that there is a genuine issue for trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). Summary judgment is precluded if there is a dispute with regard to a fact "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

■ Defendant argues that Count I of plaintiffs' third amended complaint should be dismissed because defendant did not breach any contract with plaintiffs. Defendants argue that plaintiffs' employment was an at-will employment and that defendant was under no obligation to use the progressive disciplinary procedures set out in the handbook in this situation. In their brief, plaintiffs argue that they had a contractual right to be disciplined under the progressive disciplinary procedure and to be treated fairly. Plaintiffs rely exclusively on *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980), in support of their arguments on this issue.

This Court recently spoke to this issue in *McCormick v. Sears, Roebuck and Co.*, 712 F.Supp. 1284 (1989). This Court stated:

Michigan law, applicable in this diversity action, continues to recognize the general rule that employment for an indefinite term is terminable at will; that is, terminable by either party at any time for any or no reason. *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 694–95, 316 N.W.2d 710 (1982). This rule may be altered by agreement of the parties, express or implied. *Valentine v. General American Credit, Inc.*, 420 Mich. 256, 258–59, 362 N.W.2d 628 (1984); *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980).

As in *McCormick*, the employees in the present case signed employment applications which contained language making their employment at-will and the handbook did not contain any language stating that employment with defendant would terminate only upon a showing of just cause. This Court relied on *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453 (6th Cir.1986) in support of its grant of summary judgment to defendant in *McCormick*.

The *Reid* Court stated that an employer could defeat claims that discharge could only be for good cause by having prospective employees sign application forms which indicated that employment would be terminable at will. *Id.* at 461. The Court went on to state:

Though *Toussaint* holds that there may be an implied contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will. It is well settled in Michigan that there cannot be an implied contract covering the same subject as an express one. *Steele v. Cold Heading Co.*, 125 Mich.App. 199, 203, 336 N.W.2d 1 (1983); *In re De-Haan's Estate*, 169 Mich. 146, 149, 134 N.W. 983 (1912).

790 F.2d at 462. *See Pratt v. Brown Machine Co.*, 855 F.2d 1225, 1233–1236 (6th Cir.1988). The Michigan Court of Appeals addressed this issue in *Loftis v. G.T. Products, Inc.*, 167 Mich.App. 787, 423 N.W.2d 358 (1988). The *Loftis* case is indistinguishable from the instant case. In *Loftis,* Section 19 of the employee handbook listed certain conduct which could result in discharge. Section 18 listed a four step procedure for disciplinary action. Plaintiff was fired for refusing to work overtime, a basis for discharge or discipline under Section 19. Defendant referred the matter to an employee committee which was one step under Section 18. After the committee reviewed the matter, it recommended that plaintiff be terminated and he was. Plaintiff argued that he had a right to have all four steps completed prior to termination. The trial court granted defendant's motion for summary disposition and the Court of Appeals affirmed. The Court found that the language of section 19 would leave an employee with the conclusion that refusing overtime could result in termination. *Id.* at 792, 423 N.W.2d 358. In the present case, the language of the drug free workplace policy would leave an employee with the conclusion that he would be discharged if he was found to have used drugs at the workplace or to have drugs in his system when he reported to work.

Plaintiffs point to the language in the handbook that says that employees will be treated fairly and suggest that such language makes fair treatment an element of the employment contract. Such a conclusion cannot be supported in light of the clear at-will language of the employment application form and the statement in the handbook that "[t]his handbook, with its rules and regulations, is not to be considered as generating terms and conditions of an employee contract. You have the right to terminate your employment at any time without notice, and without cause, and the company maintains the same right." This language clearly delineates the plaintiffs' employment with defendant as an at-will employment. The Court will grant defendant's motion for summary judgment as to Count I.

Count II of plaintiffs' third amended complaint alleges defamation through Asla-

nian's comments to the Michigan Department of Labor and the media. Defendant argues that it has an absolute privilege as to its statements to the Michigan Department of Labor. Defendant also argues that it has the defense of truth and of qualified privilege as to statements to the media. Plaintiffs argue that Mr. Aslanian defamed them by portraying them as heavy drug users whether or not they took the tests. Plaintiffs also argue that the claim of qualified privilege is questionable and should not be a basis for summary judgment. Plaintiffs apparently abandoned their argument with regard to the disclosures to the Michigan Department of Labor and, instead, concentrated on the disclosures to the media.

■ If a communication tends to lower the reputation of another in the estimation of the community, it is defamatory. *Swenson–Davis v. Martel*, 135 Mich.App. 632, 635, 354 N.W.2d 288, *lv. den.* 419 Mich. 946 (1984). If a communication accuses a person of a crime, it is defamatory per se. *Wilkerson v. Carlo*, 101 Mich.App. 629, 632, 300 N.W.2d 658 (1980), *lv. den.* 411 Mich. 984 (1981). When the facts concerning the dispute and the occasion of the communication are not in dispute, the question of whether there is a qualified privilege is one of law for the court. *Bostetter v. Kirsch Co.*, 319 Mich. 547, 30 N.W.2d 276, 279 (1948); *Swenson*, 135 Mich.App. at 636, 354 N.W.2d 288; *Tumbarella v. The Kroger Co.*, 85 Mich.App. 482, 493, 271 N.W.2d 284 (1978).

The Michigan courts have stated that a qualified privilege exists where "the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty." *Bostetter, supra; Swenson, supra; Tumbarella, supra.* The *Bostetter* court, setting forth the rule, stated:

> A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of

such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation.

30 N.W.2d at 280 (quoting 17 R.C.L., p. 341 and 33 Am.Jur., p. 124).

■ If the Court determines that defendant had a qualified privilege to make the statements, it must then determine whether a dispute as to a material issue of fact exists with regard to whether defendant made the statement with actual malice and whether the statements were false. *Bostetter*, 30 N.W.2d at 280–81; *Swenson*, 135 Mich.App. at 637, 354 N.W.2d 288; *Tumbarella*, 85 Mich.App. at 494, 271 N.W.2d 284; *Iacco v. Bohannon*, 70 Mich.App. 463, 467, 245 N.W.2d 791 (1976), *lv. den.* 399 Mich. 846 (1977). In order to prove actual malice, plaintiffs must show that defendant made the statements with knowledge that they were false or with a reckless disregard as to whether they were false or not. *Swenson*, 135 Mich.App. at 637, 354 N.W.2d 288.

■ In this case, plaintiffs presented copies of certain publications wherein defendant's president, Aslanian, was quoted. Defendant has stated that one of the plaintiffs initiated the media coverage of defendant's drug testing program. The Court has reviewed all of the statements of Aslanian with regard to the drug testing in this case. The Court finds that the statements of Aslanian could be considered defamatory to plaintiffs as a group but finds that defendant is protected by a qualified privilege pursuant to *Bostetter*. The *Bostetter* case is particularly instructive on this is-

sue. In *Bostetter*, plaintiff claimed that certain statements of defendant published in the local paper were defamatory. Defendant in that case had requested the city council to close a certain street pursuant to regulations of the War Department. After those regulations changed, defendant attempted to have the street opened again and apparently met with some difficulty. In order to present its side of the issue, the defendant published a letter "To the Citizens of the City of Sturgis" in the local paper. Plaintiff, a member of the city council at the time, found the statements to be defamatory. Since the defendant was attempting to put its side of the story before the general population and the general population had an interest in the information, the court found that defendant had a qualified privilege. In the present case, this Court finds that, after one of the plaintiffs contacted the media, defendant's drug testing program became an issue which was hotly debated in the community and an issue of considerable local interest. Therefore, defendant had a qualified privilege to make the statements it made in order to place its side of the story before the public.

 The Court must now look to whether plaintiffs have presented sufficient proof to survive a motion for summary judgment with regard to whether defendant made the statements with actual malice or made false statements. A review of the statements made indicate that defendant explained what the company was doing and stated that some individuals quit rather than take the test and some were discharged for positive results. Defendant never stated that the individuals who quit rather than take the tests were drug users and, contrary to plaintiffs' assertions, defendant never portrayed plaintiffs as "heavy drug users." Evidence presented by defendants indicates that only three plaintiffs allege that they have never taken drugs. Only one of those three plaintiffs is in the category of plaintiffs who tested positive. That individual indicated that the night before the test he was in the presence of people who were smoking marijuana and his test must have resulted from passive inhalation. Defendant presented

evidence that such a test result is impossible. Plaintiffs did not present any evidence to refute defendant's evidence. In light of all the facts presented to the Court, the Court finds that there is no dispute as to a material issue of fact with regard to whether defendant made the statements with actual malice. The Court finds that defendant made true statements which explained the defendant's drug testing program. In addition, defendant did not imply that all who left defendant's employ were drug users but explained that some left because they chose not to participate and some left because of positive test results. Those are all true statements. The Court will grant defendant's motion for summary judgment as to Count II of plaintiffs' complaint.

Count III of plaintiffs' third amended complaint alleges invasion of privacy under the United States and Michigan constitutions. Defendant argues that plaintiffs have no cause of action for a constitutional violation because defendant is a private not a government actor. Plaintiffs do not pursue this avenue in their response to defendant's motion for summary judgment. Plaintiffs argue solely that defendant has committed the tort of invasion of privacy according to Michigan law in the manner of drug testing and in the publication of the use of drug testing in the local media.

 The Fourth Amendment to the United States Constitution does not protect against a search or seizure by a private party on its own initiative, even if the search or seizure is an arbitrary action. *Skinner v. Railway Labor Exec. Assn.*, 489 U.S. 602, ——, 109 S.Ct. 1402, 1410, 103 L.Ed.2d 639, 657 (1989). The Court knows of no such protection under the Michigan Constitution and plaintiffs have provided no support for such protection. Plaintiffs are, therefore, left to their claims of the tort of invasion of privacy.

Michigan has recognized a right of the individual to privacy. *Beaumont v. Brown*, 401 Mich. 80, 95, 257 N.W.2d 522 (1977). The Michigan courts have recognized four types of invasions of privacy,

being (1) intrusion upon a person's seclusion or solitude or into his private affairs, (2) public disclosure about embarrassing private facts, (3) publicity which places a person in a false light in the public eye, and (4) appropriation of a person's name or likeness for defendant's advantage. *Id.* at 95 n. 10, 257 N.W.2d 522. This case involves the first two types.

■ The first type of invasion of privacy requires that there be (1) an intrusion (2) into an area where plaintiffs have an expectation of privacy and (3) such intrusion must be offensive to a reasonable person. *Saldana v. Kelsey–Hayes Co.*, 178 Mich. App. 230, 233–35, 443 N.W.2d 382 (1989); *Harkey v. Abate*, 131 Mich.App. 177, 181–82, 346 N.W.2d 74 (1983), *lv. den.* 419 Mich. 912 (1984); *Earp v. City of Detroit*, 16 Mich.App. 271, 275–77, 167 N.W.2d 841 (1969). The *Harkey* court stated that the activity must be "highly offensive to a reasonable person." 131 Mich.App. at 182, 346 N.W.2d 74. The right to be free from this type of invasion of privacy is not absolute. *Earp*, 16 Mich.App. at 276, 167 N.W.2d 841. The *Earp* court quoted 77 CJS, Right of Privacy, § 3, pp. 401, 402, which stated:

> In determining the extent of the right of privacy, it is essential to consider it in the light of duties imposed on individuals as citizens of a free country and in the light of an individual's relation to the community of which he is a member, and such right does not extend so far as to subvert those rights which spring from social conditions, including business relations, or to prohibit the publication of matter which is of public or general interest or benefit.

*Id.* at 276, 167 N.W.2d 841. *See Saldana, supra.* In *Earp*, the Court of Appeals recognized the right of the employer to investigate suspected illegal conduct of an employee committed in the course of his employment. *Saldana*, 178 Mich.App. at 235, 443 N.W.2d 382.

■ Plaintiffs in this case are divided into two classes. One class consists of plaintiffs who refused to participate in the testing and the other consists of those who

tested positive for drugs. Those who did not participate cannot succeed on this count because there was no intrusion. Therefore, Count III will be dismissed as to those plaintiffs.

As to the remaining plaintiffs, the Court finds that the taking of urine samples is an intrusion in an area in which plaintiffs may have an expectation of privacy. However, in this case, the Court finds that plaintiffs had no expectation of privacy with regard to drug testing since they had been on notice since July 17, 1989 that they might be subjected to drug testing as a condition of employment. As discussed in *Saldana, supra*, employers have a right to investigate into areas which would normally be private if the investigation springs from the business relationship. In this case, the employer was concerned about the safety of its workers and the productivity of the plant. This was a justifiable concern since the work at defendant's plant included activity which could be hazardous to someone who was not in total control of his faculties. Defendant has stated that there were several activities at its plant which gave rise to concern. The combination of the notice and the business concerns leads this Court to find that plaintiffs did not have an expectation of privacy with regard to urinalysis under the law of Michigan.

The final element of the tort is that the intrusion be offensive to a reasonable person. The Court finds that plaintiffs cannot prove this third element. The testing was carried on in the bathroom with a nurse present and the nurse was of the appropriate gender. In addition, anyone who wanted the additional privacy of a stall in which to give the sample had just to ask. This Court joins its learned colleague the Honorable George La Plata of the Eastern District of Michigan in finding that such activity is not offensive to a reasonable person. *DiTomaso v. Electronic Data Systems*, Docket Number 87–CV–60320–AA, 1988 WL 156317 (1988).

Plaintiffs also claim invasion of privacy in defendant's public disclosure of an embarrassing private fact. In order to prevail on a claim of invasion of privacy for public

disclosure, plaintiffs must prove that the disclosed information would be highly offensive to a reasonable person and that the information be of no legitimate concern to the public. *Fry v. Ionia Sentinel–Standard*, 101 Mich.App. 725, 728–29, 300 N.W.2d 687 (1980). Such information also must concern only private, not public facts, about an individual. There is no liability for giving further publicity to information which the plaintiff has already made public. *Id.* at 729, 300 N.W.2d 687 (quoting 3 Restatement Torts 2d, § 652D, comment b, pp. 385–386).

Plaintiffs have not supported this claim. It is possible that a reasonable person would find it highly offensive to have it reported that he failed a drug test. However, no plaintiff was named as having tested positively for drugs. Of more importance to the Court is that the drug testing was made public by one of the plaintiffs before defendant made any comment. In addition, the widespread media coverage which ensued from that contact with the media made the situation at defendant's plant one of public concern about which defendant had a right to comment. The Court will grant defendant's motion for summary judgment with respect to Count III of plaintiffs' complaint.

Count IV of plaintiffs' third amended complaint alleges a claim of misrepresentation based on statements in the employee manual. Plaintiffs do not present any argument on this Count in their response to defendant's motion for summary judgment. This Court recently addressed this issue in *McCormick v. Sears, Roebuck and Co.*, 712 F.Supp. 1284 (W.D.Mich.1989). This Court stated:

An action for fraudulent misrepresentation must normally be predicated upon a statement relating to a past or existing fact; future promises are contractual and do not constitute fraud. Here, all of the misrepresentations relied upon are contractual future promises. They may constitute fraud only if made in bad faith without present intention of performance. Plaintiff has presented no evidence that any of the cited representations was made in bad faith. . . .

This total absence of evidence regarding an essential element of the claim renders all other potential fact questions immaterial and is fatal to the claim.

*Id.* at 1289–90 (citations omitted). The plaintiff in *McCormick* was also relying on promises she alleged were in the employee handbook. Plaintiffs here do not present any facts separate from the handbook in support of their claim that there was misrepresentation. The Court will grant defendant's motion with regard to Count IV.

 Count V of plaintiffs' third amended complaint alleges a claim for negligent breach of contract. In Michigan, a tort action will not lie in negligence for breach of contract unless there is a breach of duty separate and distinct from the breach of contract claim. *Haas v. Montgomery Ward and Co.*, 812 F.2d 1015, 1016 (6th Cir.1987); *Mitchell v. GMAC*, 176 Mich. App. 23, 34–35, 439 N.W.2d 261 (1989). There has been no allegation of a breach of duty separate and distinct from the breach of contract in this case. The Court will grant defendant's motion for summary judgment with regard to Count V.

Count VI of plaintiffs' third amended complaint alleges a claim for violation of the Michigan Handicappers' Civil Rights Act pursuant to M.C.L. § 37.1101, *et seq.* Plaintiffs do not allege the nature of their handicap in their complaint and do not make any allegations or arguments in this regard in their response to defendant's motion for summary judgment. This Court can see no way in which this Act was violated in this case. The Court will grant defendant's motion for summary judgment with regard to Count VI.

In conclusion, the Court finds that all of plaintiffs' claims are without merit and grants defendant's motion for summary judgment as to all counts of plaintiffs' third amended complaint. Plaintiffs' third amended complaint will be dismissed.