**Richard MOHAMMED, d/b/a Richard Mohammed Construction Co., Plaintiff,**

v.

**UNION CARBIDE CORPORATION, C & H Piping, Inc., a Michigan corporation, Gandol, Inc., a Michigan corporation, James Gandol, an Individual, John A. Cummings, an Individual, Terry L. Cholette, an individual and Kenneth R. Hendrix, an Individual, Defendants.**

Civ. A. No. 83CV–6375–AA.

United States District Court,
E.D. Michigan, S.D.

March 14, 1985.

254

Jack C. Chilingirian, St. Clair Shores, Mich., for plaintiff.

David G. Chardavoyne, James A. Smith, Karen L. Piper, Bodman, Longley & Dahling, Detroit, Mich., John A. Lygizos, Lygizos & Janhevich, Dearborn, Mich., Gerald J. Young, Young & Gorny, Birmingham, Mich., Gene J. Esshaki, Mary P. Nelson, Abbott, Nicholson, Quilter, Esshaki & Youngblood, P.C., C. Nicholas Revelos, Detroit, Mich., for defendants.

### MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case is before the court on the motion of defendant Union Carbide for sum-

mary judgment, and on the motion of defendant Gandol, Inc., and James Gandol for sanctions pursuant to Fed.R.Civ.P. 11. For the reasons stated herein, both motions are granted.

FACTS

This case arises out of the expiration of a contract between plaintiff, a provider of excavation and concrete pouring services, and defendant Union Carbide, the purchaser of plaintiff's services. The original complaint was brought in 14 counts [1] against Union Carbide, John Cummings, Union Carbide's plant manager for the Ecorse facility at which plaintiff performed construction services for Union Carbide; C & H Piping, Inc. and its principals; Terry Cholette and Kenneth Hendrix; and Gandol, Inc. and its principal, James Gandol.

The parties to Union Carbide's motion for summary judgment appear to agree to the following facts:

Union Carbide operates a facility in Ecorse, Michigan, which separates air into its constituent gases and sells those gases. The facility's major purchaser is Great Lakes Steel, which has a plant that surrounds the Ecorse facility. By agreement between Union Carbide and Great Lakes Steel, the latter supplies personnel to operate the facility and to perform maintenance and construction work on it. Union Carbide cannot use its own operators or select its own outside construction and maintenance contractors unless Great Lakes Steel declines to supply personnel for a particular job.

Plaintiff first worked at the Ecorse facility as subcontractor for C & H Piping, Inc. In April of 1980, plaintiff entered into a one-year time-and-materials contract to provide such excavation and cement work as

1. The original complaint contained the following counts: (1) Contract, conspiracy and restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1; (2) Monopolization, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (3) Slander and disparagement; (4) Libel and disparagement; (5) Tortious interference with contractual relations; (6) Interference with actual and potential contracts; (7) Violation of Michigan antitrust law, M.C.L.A. § 445.701 *et seq.;* (8) Common law conspiracy violations; (9) Fraud, misrepresentation and deceit; (10) Michigan statutory unfair competition; (11) Exemplary or punitive damages; (12) Breach of contract; (13) Bid rigging; and (14) Accounting.

Union Carbide might request of him, at rates specified in the agreement.

This "time-span" order between plaintiff and Union Carbide was extended for an additional year in April of 1981, and was later extended to August 31, 1982. The time-span order then expired by its terms. At that time, both plaintiff and defendant Gandol had been performing time-span work at the Ecorse facility. Union Carbide has provided evidence by way of deposition testimony that certain Union Carbide officials decided that two such time-span excavation and cement contractors were unnecessary, and that Gandol would be retained because it hired union employees, whereas plaintiff was not a union shop.

Union Carbide contends that the decision to allow plaintiff's time-span order to expire was made by Cummings and Randy Kramer, a Union Carbide purchasing agent stationed in Cleveland. Two other Union Carbide employees also took part in the decision, but Union Carbide steadfastly maintains, and has provided evidence to establish that the decision was made entirely by Union Carbide personnel, without any input or influence by persons outside of the company.

Plaintiff just as steadfastly maintains that other entities, such as Great Lakes Steel and the United Steelworkers of America Local 1299 Union, whom he has recently added as defendants in this case, as well as Gandol and C & H, put pressure on Union Carbide to terminate plaintiff's time-span contract, thereby permitting Gandol to completely replace him. Despite two lengthy extensions of the discovery period by this court, however, plaintiff has failed to apprise the court of any evidence of such a conspiracy between Union Carbide and any of the parties to the original complaint, or either of the parties recently named in the amended complaint.

Union Carbide concedes that the decision to allow plaintiff's time-span contract to expire, and to retain Gandol as the sole time-span contractor, was motivated in large part on Gandol's union status, and plaintiff's lack of union affiliation. It contends that it sought to avoid labor friction at the Ecorse plant that might arise from the presence of non-union laborers working at the same site with union laborers. Such labor friction would cause problems for Union Carbide's customer, Great Lakes Steel, which conducts business with labor organizations such as Local 1299. Despite its concerns about the possibility of such labor friction, Union Carbide continued to employ plaintiff at the Ecorse facility on a "fixed price" basis, whereby plaintiff was asked to quote a price to complete a particular job, rather than seeking payment on an hourly basis.

Plaintiff agrees that his contract was terminated because his company was not a union shop, and further contends that the decision to terminate his contract was affected by an agreement between the various defendants. Plaintiff further points to the apparent contradiction in Union Carbide's decision to terminate his time-span order because of its desire to prevent a mixed, union/non-union labor force at the Ecorse facility, while nonetheless permitting plaintiff and his non-union employees to remain at the facility on a fixed price basis.

*Procedural History*

Because the procedural history of this action is relevant to the disposition of the motions before the court, it will be recounted here in short summary. The original complaint was filed on October 7, 1983. Subsequently, the depositions of plaintiff, and defendants Cummings and James Gandol were taken. Gandol, Inc. and James Gandol moved for summary judgment on March 9, 1984, arguing that plaintiff had failed to identify the existence of any evidence at his own deposition that would support any of his allegations against those defendants. Plaintiff responded by asserting that he needed additional time to complete discovery in this case, which included deposing various Union Carbide employees, and that summary judgment on the antitrust claims was inappropriate at that stage in the proceedings.

The motion was heard on April 17. The court granted plaintiff's request for an additional 90 days from the date of the hearing in which to conduct discovery. It also granted Gandol's motion in part, however, dismissing the libel and slander claims, ordering consolidation of Counts V and VI (tortious interference with contractual relations), and striking Count X (unfair competition under state law) unless plaintiff amended the complaint to designate the particular statute under which the claim was brought. The court denied the motion with respect to the remaining counts without prejudice to Gandol's rights to renew the motion upon completion of discovery.

On June 14, a month prior to the date when the extended discovery period was scheduled to expire, plaintiff moved for yet another 90 days in which to complete discovery, urging that certain defendants had been remiss in providing him with requested documents, and that certain depositions had not been completed. In an order dated June 25, the court granted the motion to extend the discovery period, and specifically stated that Gandol could renew its motion for summary judgment after September 17.

On July 3, the court entered an order, pursuant to a stipulation by the parties, to dismiss plaintiff's slander and libel claims against C & H Piping, without prejudice.

On October 22, 1984, Gandol, Inc. and James Gandol did renew their motion for summary judgment, again asserting that, notwithstanding the extensive discovery taken in the case at that time, plaintiff had still failed to adduce any evidence that either of the moving defendants had engaged in conduct that would support a claim under any of the theories of liability enumerated in the original complaint. Plaintiff filed a contemporaneous motion to amend the complaint, seeking to add Great Lakes Steel as a party defendant and certain unnamed labor organizations. In response to

Gandol's motion for summary judgment, plaintiff submitted a single document, a procurement plan summary sheet prepared by employees of Union Carbide. The plan evinced a desire on the part of its authors to prevent plaintiff from obtaining "fixed-price" awards, because he had been obtaining exorbitant profits as a result of charging Union Carbide union-scale prices, but failing to pay union-scale wages to his employees.

Plaintiff also contended in his response that a Union Carbide employee had testified at deposition that he believed that James Gandol had attempted to bribe him in order to obtain an exclusive time-span order from Union Carbide.

The court concluded that plaintiff had failed to demonstrate the existence of a genuine question of fact concerning any of the material issues of the remaining counts in the original complaint asserted against the Gandol defendants and granted the motion for summary judgment. The court also granted plaintiff's motion to add additional parties to the complaint, but specifically prohibited him from naming Gandol, Inc. or James Gandol in the amended complaint.

Union Carbide has now moved for summary judgment against all of the claims asserted against it in the first amended complaint. Gandol, Inc. and James Gandol have moved for the imposition of sanctions against plaintiff under Fed.R.Civ.P. 11.

DISCUSSION

### Union Carbide's Motion For Summary Judgment

Union Carbide's motion for summary judgment is directed at plaintiff's first amended complaint, which was filed after the court dismissed certain counts of the original complaint as against defendant Gandol, Inc. and James Gandol. The amended complaint is brought in six counts,[2] and Union Carbide seeks summary judgment on all counts.

---

**2.** The amended complaint contains the following counts: (1) Contract, conspiracy and restraint of trade, in violation of 15 U.S.C. § 1; (2) Monopolization, in violation of 15 U.S.C. § 2; (3) Violation of Michigan antitrust laws; (4) Common law conspiracy; (5) Fraud; and (6) Breach of contract.

### Count I—Violation of Section 1 of the Sherman Act

Count I of the first amended complaint asserts that the defendants engaged in a contract, combination or conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

 Union Carbide correctly argues that unilateral conduct on the part of a defendant is not actionable under § 1, *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190 (6th Cir.1982) *cert. denied sub nom* — U.S. ——, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984). Union Carbide asserts, and the court agrees, that the uncontradicted deposition testimony taken to date in this matter, which has been voluminous, clearly indicates that Union Carbide officials alone were responsible for the decision to allow plaintiff's time-span contract to terminate. Plaintiff contends that the testimony of the Union Carbide employees is self-interested and inherently incredible, and that he should be permitted to go to trial to challenge the credibility of these persons, arguing that evidence of a conspiracy is largely in the hands of the alleged conspirators. The court might be inclined to permit plaintiff to proceed to trial on his antitrust claims against Union Carbide if he had produced some evidence of the alleged conspiracy. He has not done so. Consequently, the court will apply the traditional standards of Fed.R.Civ.P. 56, and concludes that Union Carbide is entitled to judgment as a matter of law. *See Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 948 (6th Cir.1983).

### Count II—Violation of Section 2 of the Sherman Act

 Plaintiff alleges in Count II of the first amended complaint that, "as a result of the actions and conspiracy and attempted monopoly by Gandol and the combination of said defendants, the Plaintiff has been eliminated as a competitor in the relevant market." This count does not clearly set forth an allegation of monopolization or attempted monopolization against Union Carbide under Section 2 of the Sherman Act, 15 U.S.C. § 2. To the extent that plaintiff has asserted such a claim against Union Carbide, it must fail. Union Carbide is not a competitor of plaintiff in the relevant product market, the provision of excavation and cement pouring services. Plaintiff is therefore without standing to assert a § 2 claim against Union Carbide, *Smith v. Northern Michigan Hospitals, Inc., supra,* 703 F.2d at 954–55.

### Count III—Violation of Michigan Antitrust Laws

 To the extent that plaintiff asserts a claim against Union Carbide for a contract, combination, and conspiracy in restraint of law under Michigan statute, M.C.L.A. § 445.701 *et seq.,* that claim is infirm for the same reason that his claim under § 1 of the Sherman Act must fail. *See Michigan Association of Psychotherapy Clinics v. Blue Cross-Blue Shield,* 118 Mich.App. 505, 518, 325 N.W.2d 471 (1982) (evidence of concerted action necessary to support a claim under § 445.701).

### Count IV

 Union Carbide correctly argues that there is no private civil action for conspiracy under the common law of Michigan. Rather, an allegation of conspiracy must be coupled with a substantive theory of liability in order to sustain a cause of action. *See Earp v. City of Detroit,* 16 Mich.App. 271, 275, 167 N.W.2d 841 (1969). Consequently, plaintiff's allegations that Union Carbide's conduct amounted to common-law conspiracy does not set forth an independent cause of action, and summary judgment must be granted with respect to this count.

### Count V—Fraud

 Union Carbide maintains that plaintiff's fraud claim, by his own deposition testimony, is predicated upon a statement made to him by Cummings that the low bidder on the maintenance job would receive the time-span contract. As a general proposition, a promise to do something in the future can not serve as the factual

predicate in a cause of action for fraud. Rather, a claim of fraud must be grounded upon a statement concerning a past or present fact or event that the speaker knows to be false at the time of the statement, or which statement is made with reckless disregard for its lack of accuracy. *See Hi-Way Motor Co. v. International Harvester*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976). This general rule is tempered by the exception that a person who makes a promise in "bad faith", without any intention of performing it at the time that the promise is made, may subject himself to liability for fraud. *See Atlas Concrete Pipe v. Roger J. Au & Son*, 467 F.Supp. 830, 838 (E.D.Mich.1979), *rev'd on other grounds*, 668 F.2d 905 (6th Cir.1982).

In his response to the motion for summary judgment, plaintiff addresses the court to a request for quotation, dated May 10, 1983, by which Union Carbide invited plaintiff to bid on a contract for "Miscellaneous Maintenance Work" at the Ecorse facility, which contract was to run from June of 1983 through May of 1984. Plaintiff contends that this invitation was fraudulent, because, as the procurement plan summary sheet prepared in January of 1983 indicates, Union Carbide had already determined to terminate plaintiff's time-span contract. Thus, plaintiff argues, Union Carbide promised to entertain his bid, but had no intention of doing so.

Union Carbide responds that Mr. P.J. McKenna, who sent the invitation to bid to plaintiff, has testified that, at the time he sent the invitation, he had every intention to award the contract to the lowest bidder. Further, the procurement plan summary that was drafted by various Union Carbide employees in January, which addressed certain problems created by plaintiff's non-union status, did not foreclose the award of future construction contracts to plaintiff. The court concludes therefore that plaintiff has failed to demonstrate the existence of genuine dispute of fact concerning McKenna's bad faith in soliciting the bid. Thus, the bad faith exception to the general rule that a breach of a promise does not constitute fraud does not apply. Consequently,

Union Carbide is entitled to summary judgment on Count V.

### Count VI—Breach of Contract

■ Plaintiff alleges in Count VI that Union Carbide had a published and unpublished policy to renew the contracts of suppliers who provided satisfactory services, and that Union Carbide violated this policy by cancelling plaintiff's time-span contract. As Union Carbide has demonstrated, plaintiff's final time-span contract expired by its terms on August 31, 1982. Union Carbide denies that it had any such policy of automatic renewal of expired contracts, and plaintiff has failed to apprise the court of any evidence whatsoever of such a policy, published or unpublished. Further, even assuming the existence of such a policy, plaintiff has failed to articulate how the policy would create enforceable contractual rights on behalf of plaintiff, or in the alternative, how he relied to his detriment on such a policy. For the foregoing reasons, Union Carbide is entitled to summary judgment on Count VI of plaintiff's first amended complaint.

### The Alleged Conspiracy Involving Great Lakes Steel and Defendants Local 1299

■ Although the foregoing ruling effectively disposes of all remaining claims against Union Carbide on the merits, the court would like to take this opportunity to address an additional issue raised by plaintiff in his response to this motion. Plaintiff contends that, at the conclusion of his extensive discovery efforts in this case, he now believes that Union Carbide has conspired with Great Lakes Steel, Local 1299, and perhaps others to eliminate him as a provider of excavation and cement services at the Ecorse plant, and that such conduct constitutes a group boycott, in violation of Section 1 of the Sherman Act. The court has already determined that plaintiff has failed to provide the court with sufficient evidence of such a conspiracy to withstand the motion for summary judgment. Even if plaintiff had been able to prove the exist-

ence of such a conspiracy, however, such conduct would arguably be protected under the federal labor laws.

Plaintiff relies on the case of *Connell Construction Co. v. Plumbers & Steamfitters Local Union 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) for the proposition that a labor organization forfeits its statutory and non-statutory immunity from antitrust liability when it engages in certain concerted action with non-labor organizations. The *Connell* Court held that a labor union might be liable for antitrust violations when it placed direct pressure on a general contractor to prevent the latter from entering into sub-contracting agreements with non-union employers. The *Connell* Court found that such direct pressure, in the form of picketing at the general contractor's work sites, would not be protected by the union's traditional sources of immunity from antitrust law when the union had no intention of organizing the target of its picketing activities, and when the union was not seeking to ensure an all-union labor force at a single work site, 421 U.S. at 630–33, 95 S.Ct. at 1839–40.

The *Connell* opinion clearly distinguishes the situation where a labor organization in the construction industry brings secondary pressure to bear on an employer when its purpose is to obtain an all-union labor force at a particular job site. Indeed, Congress created such an exception to the general prohibition against secondary activity in favor of labor organizations in the construction industry in 29 U.S.C. § 158(e), § 8(e) of the National Labor Relations Act. The *Connell* Court found this exception to be inapplicable on the facts of that case. In this case, on the other hand, both plaintiff and Union Carbide agree that plaintiff's time-span order was not renewed because Union Carbide sought to avoid labor friction at the Ecorse facility, a situation that § 8(e) was designed to address. Consequently, *Connell* is clearly distinguishable from the instant case, as is the subsequent case of *Muko, Inc. v. Southwestern Pennsylvania Building and Construction Trades Council*, 609 F.2d 1368 (3rd Cir. 1979) (en banc), which relied on *Connell.*

Thus, even assuming that plaintiff is able to establish that Local 1299 had conspired with Union Carbide and Great Lakes Steel to preclude plaintiff from working at the Ecorse facility, such conduct by the union would clearly constitute protected activity for the purposes of § 8(e), thereby immunizing the union from liability under the federal antitrust statutes. Although the cases to which the court's attention have been directed do not address the issue, this court presumes that if the union's activity is protected, liability can not be imposed upon an employer or the supplier of the employer such as Union Carbide under the antitrust laws for concerted action that seeks to establish an all-union job site. If the contrary were true, a frustrated non-union sub-contractor such as plaintiff could undermine the statutory protection afforded to secondary activity by § 8(e) by proceeding against the employer or secondary supplier, as plaintiff has done in this case.

For the foregoing reasons, plaintiff's conspiracy theory, even if grounded in reality, does not appear to be actionable against either Union Carbide, Great Lakes Steel, or Local 1299. The court addresses this issue merely because it has been raised and extensively briefed by the parties. This opinion should not be read as an adjudication of the claims against Local 1299 or Great Lakes Steel, however. To reiterate, the court has predicated its holding that Union Carbide is entitled to summary judgment with respect to the claims of conspiracy or combination in restraint of trade, as set forth in Count I, on the grounds that plaintiff has failed to demonstrate the existence of sufficient evidence of concerted activity.

### *Gandol's Motion For Sanctions Pursuant to Rule 11*

Gandol has moved for an award of the costs and attorneys fees that it has incurred in the defense of this matter, pursu-

ant to Fed.R.Civ.P. 11 [3], arguing that plaintiff failed to conduct a reasonable inquiry into the allegations that he interposed against Gandol prior to filing the complaint.

### 1983 Amendment of Rule 11 and the Duty to Make Reasonable Inquiry

■ Rule 11 of the Federal Rules of Civil Procedure, which prohibits the filing of pleadings, motions and other papers "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," was amended in 1983, effective August 1. The amended rule was therefore applicable to the original complaint that was filed in this case on October 7 of that year. The Notes of the Advisory Committee for the 1983 amendments to the Rules state that Rule 11 has been strengthened to provide greater protection against the filing of frivolous claims. Indeed the explanatory notes invite judges to make more frequent use of the amended Rule than has previously been the case.[4]

■ Prior to the recent amendment of Rule 11, the courts had consistently construed the prohibition against frivolous practice to implicate conduct that amounted to bad faith. *See Nemeroff v. Abelson,* 620 F.2d 339, 350 (2d Cir.1980). Such a standard is by its very nature highly subjective, prompting an inquiry into the motives and intentions of the attorney or client who have been accused of improper use of legal process. Indeed, plaintiff's attorney in this case has defended against this motion with an argument that the court can not make a reliable determination about such mental phenomenon simply by examining in *ex post facto* fashion the pleadings that he filed in this case. The court agrees that a determination of an attorney's subjective bad faith is a dubious endeavor in many cases, and believes that the use of the bad faith standard frustrates the effective enforcement of Rule 11.

■ One of the important additions to the amended rule is the requirement that an attorney make "reasonable inquiry" into the operative facts and relevant law before signing his name to a pleading, motion or other party, which signature constitutes his certificate that the paper is "well grounded

---

**3.** Amended Rule 11 provides as follows:

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper, that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a plead-

ing, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

**4.** Experience shows that in practice Rule 11 has not been effective in deterring abuses. There has been considerable confusion as to (1) the circumstances that should trigger striking a pleading or motion or taking disciplinary action, (2) the standard of conduct expected of an attorney who signs pleadings and motions, and (3) the range of available and appropriate sanctions. . . .

The amended rule attempts to deal with the problem by building upon and expanding equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation.

Notes of the Advisory Committee to Amended Rule 11 (citations omitted).

in fact and is warranted by existing law or a good faith argument for the extension of existing law." Unlike the subjective good faith of an attorney, "reasonable inquiry" is an empirically verifiable fact or event, inasmuch as the court can examine the efforts undertaken by the attorney to investigate her claim prior to filing suit. The focus of such an inquiry is upon events that can be observed and verified to some extent: what the attorney learned from his client, what efforts he undertook to corroborate the client's account, and so on. Any determination of what constitutes a "reasonable inquiry" depends largely on the particular facts and circumstances of a given claim. The court recognizes that there are many ways by which an attorney can reasonably apprise himself of the legitimacy of a claim prior to pursuing it in court, but the "reasonable inquiry" standard at the very least requires some kind of investigation, some affirmative conduct on the part of the attorney. By focusing upon the investigative efforts undertaken by the attorney, rather than seeking to scrutinize the unfathomable processes of his mind, the court is better able to apply the strictures of Rule 11 objectively and fairly.

Although courts that have applied Rule 11 since its amendment have on occasion continued to rely on the "bad faith" standard, *see Tedeschi v. Smith Barney, Harris Upham & Co., Inc.*, 579 F.Supp. 657, 663 (S.D.N.Y.1984), others have adverted to the requirement of reasonable inquiry in concluding that the conduct of an attorney should be reprimanded, *see Wold v. Minerals Engineering Co.*, 575 F.Supp. 166, 167 (D.Colo.1983); *Van Berkel v. Fox Farm and Road Machinery*, 581 F.Supp. 1248, 1250 (D.Minn.1984).

In the instant case, Gandol focuses in particular upon plaintiff's allegations of libel and slander, contained in Counts III and IV of the original complaint, which were dismissed in Gandol's original motion for summary judgment. Gandol asserts in this motion that plaintiff conceded at his deposition that he had no evidence that Gandol had uttered a slanderous statement or published a libelous account concerning

him. In his response to Gandol's first motion for summary judgment, plaintiff failed to offer any evidence to support the allegations of defamation. Gandol again complains of plaintiff's conduct with respect to the defamation claims in the instant motion, and plaintiff has again failed to come forward with any evidence to support those charges. More important, Gandol asserts that plaintiff's attorney failed to make any inquiry whatsoever concerning any of the claims contained in his original complaint asserted against Gandol. Plaintiff's attorney offers no evidence of such inquiry, but argues that he pursued these claims in good faith, and that his institution of this action was justified by his duty to zealously represent his client.

Notwithstanding counsel's duty to zealously represent his client, an attorney is also obligated to refrain from raising claims without first conducting reasonable inquiry into the underlying facts and law on which those claims are predicated. Counsel has a duty to his client, and he has a duty to the fair administration of justice as well. *See Van Berkel, supra* 581 F.Supp. at 1251. Although there may be instances in which the attorney will perceive a conflict between the interests of his client and the interest of the fair administration of justice, there is in fact no such conflict. An attorney is obligated to dissuade his client from pursuing specious claims, and thereby avoid possible sanctions by the court, as well as unnecessary costs of litigating a worthless claim. Although reasonable attorneys may differ about whether a particular claim is deserving of litigation, the obligation to counsel the client against bringing meritless claims, and to conduct reasonable inquiry before instituting suit, are clear and unambiguous in all cases.

In this case, plaintiff's attorney has failed to demonstrate to the satisfaction of this court that he discharged his duty of reasonable inquiry prior to filing his allegations of slander and defamation. Although he argues that it would be futile

to conduct a full-scale inquiry into an alleged conspiracy to restrain trade prior to filing suit, when the attorney is without the investigative tools provided by the rules of discovery, and the evidence is entirely within the control of adverse parties, such is not the case with charges of defamation, which by definition are notorious, public acts. Plaintiff's failure to conduct any investigation whatsoever into these claims is apparent from the present record, and this failure requires the court to impose sanctions under Rule 11. Rule 11 expressly provides for the imposition of sanctions against both the offending party and his attorney. The court will impose joint and several liability on plaintiff and his attorney for any amounts ultimately awarded to Gandol as sanctions under Rule 11.

The most prevalent form of sanction imposed by the courts under Rule 11, and one specifically permitted by the rule, is an award of attorney's fees and costs. Gandol has requested full reimbursement for its costs and attorney's fees incurred in the defense of this matter above those expenses for which it received insurance coverage. Gandol asserts that it has expended $26,000 for attorneys fees, and paid $3,253.70 for deposition transcripts in defending against this action. It further asserts that it has received $7,500 in insurance proceeds to defray part of these costs, leaving it with unreimbursed expenses of $21,753.70. Gandol seeks an award of this entire amount as a sanction of plaintiff's violation of Rule 11.

█ Plaintiff correctly objects to this request on the grounds that Gandol has failed to submit a detailed affidavit or other summary of how these expenses were incurred. In particular, Gandol has not apprised the court of the nature of the fee agreement between itself and its attorneys. On the assumption that Gandol's attorneys are working on an hourly basis, the court finds that Gandol should have submitted an itemized statement of the number of hours spent by its attorneys, a description of the particular services conducted during that time, and the hourly rate that the attorneys

charged for those services. Without such an accounting, the court is unable to make an objective determination on the amount of money to which Gandol is entitled.

█ Further, as Judge Weinfeld stated in *Tedeschi*, the prevailing party in a Rule 11 motion is not necessarily entitled to full reimbursement of its entire litigation expenses:

The assessment of fees against a nonprevailing litigant must be fair and reasonable based upon the particular circumstances of the case, including the financial resources and ability of the parties against whom the award is made and the financial status of the prevailing party. In sum, the equities of the situation are to be considered to assure that although the purpose of discouraging bad faith, vexatious suits is enforced, a losing party is not subjected to financial ruin.

579 F.Supp. at 664 (footnote omitted).

█ In this case, the court concludes that, although the failure of plaintiff's counsel to conduct a reasonable inquiry into the merits of the defamation claim justifies an imposition of sanctions under Rule 11, the difficulty of investigating the conspiracy and monopolization claims prior to the initiation of the lawsuit lessens the extent of investigative efforts that an attorney must undertake to satisfy the "reasonable inquiry" standard. Gandol has not demonstrated that plaintiff's attorney failed to make reasonable inquiry, under the circumstances, with respect to his antitrust claims prior to initiating this lawsuit. Consequently, the court concludes that Gandol is entitled to recovery of those expenses incurred only until and including the hearing on its first motion for summary judgment, at which the defamation claims were dismissed by the court.

Gandol is therefore ordered to submit to this court an itemized statement of its expenses, including costs and attorney's fees, incurred in this matter until and including April 17, 1984. The statement should be submitted within 20 days of the date of this

order, or Gandol will be deemed to have waived its right to recovery under this order. Plaintiff will then have 20 days in which to file any objections he may have to this statement, although he is advised to focus his objections upon the calculations in the statement, such as the hourly rate charged by Gandol's attorneys, or the amount of time expended in handling a particular matter, rather than contesting the propriety of awarding sanctions at all. The court reiterates its strong preference that these matters be handled by stipulation of the parties if possible.

SO ORDERED.