957 F.2d 268
 121 Lab.Cas. P 56,821, 7 IER Cases 318
 Ralph BAGGS; Vern Baggs, Jr.; Gary A. Delecki; Lori J.
Glick; Merrill J. Hansen; Tracy Helsel; Robert Kanaziz;
Anthony F. Krol; Penny J. Pahl; Gary Parker; Gary
Roessler; Mark Russell; David Wilson; Mary Ann Fender;
Walter Montney; Patricia Russell; Daniel Schelske; Nadine
Wells; James D. Wilson, II; James MacDonald, Plaintiffs-Appellants,
Thomas A. Brown; Bill Elya, III; Garry Moore; Timothy
Morrison; Deane W. Pahl, Plaintiffs,
v.
EAGLE-PICHER INDUSTRIES, INC., an Ohio corporation,
Defendant-Appellee.
 No. 90-1949.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 21, 1992.
Decided Feb. 27, 1992.
 
 Craig W. Elhart (argued and briefed), Elhart & Power, Traverse City, Mich., for plaintiffs-appellants.
 Jon G. March (argued and briefed), Jennifer DeLessio (briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, Mich., for defendant-appellee.
 Before GUY, NORRIS and BATCHELDER, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 The plaintiffs in this private-sector employee drug testing case appeal the district court's grant of summary judgment dismissing their breach of contract, defamation, and invasion of privacy claims against their former employer. We affirm.
 
 I.
 
 2
 Until August 1989, the plaintiffs worked for the defendant, Eagle-Picher Industries, Inc., at Eagle-Picher's Trim Division plant in Kalkaska, Michigan. The Trim Division manufactures interior trim for use in automobiles. Some of the plant's 230 employees work with potentially hazardous materials, including hot adhesives.
 
 
 3
 Each applicant for employment at the plant was required to sign a form acknowledging that Eagle-Picher could terminate the employment at any time, with or without notice.[1] Upon hiring, each new worker received an employee handbook. The version of the handbook given to the plaintiffs had been prepared when the plant was known as Fabricon Automotive Division. The Fabricon handbook contained a pledge by Eagle-Picher to treat employees fairly, followed by a list of ten rules of employee conduct. The first rule prohibited intoxication while on duty and use or possession of drugs on company premises. The handbook also spelled out a four-step system of progressive discipline but noted that severe infractions could result in immediate discharge.
 
 
 4
 In late 1988, Trim Division President Michael Aslanian became concerned about drug use among employees. According to Aslanian, several employees complained to him about drug use by fellow workers. Aslanian also stated that truck drivers making deliveries to the plant had commented to management about employee drug use. The plant's management responded in April 1989 by promulgating a drug-free workplace policy. That policy prohibited employees from possessing, using, or being under the influence of drugs while at work. The policy also provided for drug testing of employees under certain circumstances. The new policy was posted on employee bulletin boards.
 
 
 5
 Aslanian also communicated his concerns to the Kalkaska County Sheriff and the Grand Traverse Narcotics Team. With Aslanian's encouragement, an undercover agent worked in the plant to observe employees. As a result of the agent's surveillance, two employees were arrested in June 1989 for selling drugs. In order to dramatize the situation, Aslanian allowed the police to arrest the employees at work. According to Aslanian, the undercover agent told him that 60 percent of the workforce used illegal drugs.
 
 
 6
 The Trim Division strengthened its drug policy in July 1989. Among other changes, the new policy provided that "reporting to work with alcohol, illegal or illicit drugs in the employee's system is a violation of Company rules and will result in disciplinary action, up to and including discharge." This revision strengthened the earlier provision that only prohibited an employee from working under the influence of drugs. The new policy also provided that submission to a drug test at management's request was a "condition of employment." The previous policy had provided for drug testing only in certain circumstances. The new policy was posted on employee bulletin boards on July 17, 1989. On August 7, 1989, Eagle-Picher distributed a new employee handbook containing the revised drug policy.
 
 
 7
 Eagle-Picher carried out a surprise drug screening on August 10 and 11, 1989. At a meeting of employees, Aslanian announced that each employee would be required to submit a urine sample as a condition of continued employment. Nine employees, including seven of the plaintiffs, refused the test and left the plant. Eagle-Picher treated the refusals as voluntary resignations. One of the plaintiffs refused the test but declined to leave the plant. Eagle-Picher terminated his employment.
 
 
 8
 The remaining employees, over 200 in number, submitted to the urine test. The employees filled specimen jars in the employee lavatories. Male employees used a urinal in the presence of a male nurse. Female employees used a stall while a female nurse stood outside. Employees absent on August 10 were tested at a local health clinic.
 
 
 9
 Eagle-Picher received the test results six days later. Eagle-Picher immediately terminated the employees who tested positive for drugs, including twelve of the plaintiffs. On each terminated employee's record, Eagle-Picher listed violation of an unspecified company policy as the reason for termination.
 
 
 10
 One of the plaintiffs who tested positive denied drug use and contended that his positive result stemmed from passive inhalation of marijuana smoke. The other plaintiffs who tested positive have admitted that they have used illegal drugs. Eight of the ten plaintiffs who refused to submit to the test also have admitted illegal drug use. The other two plaintiffs who declined to be tested have denied any illegal drug use.
 
 
 11
 In response to requests from the media, Aslanian commented on the testing program. In published remarks, Aslanian stated that some employees had refused to take the tests and that others had tested positive. Aslanian also made statements about the severity of the drug problem at the plant. Aslanian did not refer to any employee by name.
 
 
 12
 The plaintiffs filed this action in Kalkaska County Circuit Court shortly after their terminations. The complaint contained six counts: (1) breach of employment contract; (2) defamation; (3) invasion of privacy; (4) misrepresentation; (5) negligence; and (6) violation of Michigan Handicappers' Civil Rights Act, Mich.Comp. Laws Ann. § 37.1101 et seq. Eagle-Picher, an Ohio corporation, removed the case to federal district court.
 
 
 13
 After discovery, the district court granted Eagle-Picher's motion for summary judgment. Baggs v. Eagle-Picher Indus., Inc., 750 F.Supp. 264 (W.D.Mich.1990). The court first held that the plaintiffs were employees at will and had no contractual right to progressive discipline. The court next held that Aslanian's comments to the media were protected by a qualified privilege. Third, the court dismissed the invasion of privacy claim, holding that the plaintiffs lacked an expectation of privacy and that Eagle-Picher had not disclosed any private facts to the public. The court dismissed the misrepresentation count, holding that the plaintiffs' claim involved only future promises, not false statements of fact. Fifth, the court dismissed the negligence count on the ground that Eagle-Picher's duties were contained in the contract. Finally, the court dismissed the Handicappers' Act claim, holding that the plaintiffs failed to allege the nature of their handicap.
 
 
 14
 This appeal followed. On appeal, the plaintiffs challenge the district court's grant of summary judgment against the breach of contract, defamation, and invasion of privacy claims. They apparently have abandoned the remaining counts.
 
 II.
 
 15
 We review grants of summary judgment de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriately granted when the pleadings, affidavits, and other submissions demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 A.
 
 16
 The plaintiffs first argue that there is a genuine issue of material fact as to whether Eagle-Picher breached the plaintiffs' employment contracts. Specifically, the plaintiffs contend that there is an issue of fact as to whether the employee handbook created a contract right to progressive discipline and fair treatment. We disagree.
 
 
 17
 The plaintiffs concede that the language on their employment applications created at will employment. However, the plaintiffs maintain that the handbook, by expressly providing for fair treatment and a progressive discipline system, altered the employment relationship. The plaintiffs' argument relies heavily on language from the landmark case of Toussaint v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 292 N.W.2d 880 (1980). In Toussaint, the Michigan Supreme Court held that an employer's statements, including those contained in employee handbooks, could convert a presumptive at will employment relationship into a contract terminable only for cause. Id., 292 N.W.2d at 891-92.
 
 
 18
 The contours of the rights established in Toussaint have been heavily litigated, and the Michigan Supreme Court has revisited the issue repeatedly. In Renny v. Port Huron Hospital, 427 Mich. 415, 398 N.W.2d 327 (1986), the court stated that employers retain the right to require applicants to acknowledge that they will serve as at will employees. Id., 398 N.W.2d at 334. Three years later, the court held that an employer could, with adequate notice, reestablish an at will relationship by unilaterally revising the written policy statements that had created a just cause employment contract. In re Certified Question, 432 Mich. 438, 443 N.W.2d 112, 121 (1989).
 
 
 19
 Most recently, the court explained the scope of Toussaint in Rowe v. Montgomery Ward & Co., 437 Mich. 627, 473 N.W.2d 268 (1991). In Rowe, the plaintiff received several employee handbooks containing disciplinary procedures. The court held, however, that there was no jury question as to whether the handbooks created a just cause contract because the most recent handbook stated that the employment relationship was at will. Id., 473 N.W.2d at 277. The court distinguished the employee handbooks distributed in Toussaint, noting that those handbooks expressly stated that employees would be terminated only for just cause. Id. at 276.
 
 
 20
 We hold that the plaintiffs had no contractual right to progressive discipline. The language of the employee handbook does not state that progressive discipline will be used in all cases. On the contrary, the handbook expressly provides that the "steps may not always be followed. It depends on how serious or negligent the initial offense is. If a serious offense takes place, discharge may result without any of the other warnings taking place." (Emphasis added). In a series of actions beginning in April 1989, Eagle-Picher made it abundantly clear that it regarded any violation of the drug policy as a serious offense. Therefore, we find that there is no question for the jury as to whether the plaintiffs were entitled to progressive discipline before termination.
 
 
 21
 We also hold that the employee handbook did not create a jury question as to whether the plaintiffs could be discharged only for cause. Unlike the handbooks at issue in Toussaint, Eagle-Picher's handbook never expressly stated that employees would be discharged only for cause. The handbook contained a list of rules, but never suggested that an employee could be discharged only for violating these rules. When faced with an identical claim based on a list of rules distributed to employees, the Michigan Supreme Court held:
 
 
 22
 Nothing in the rules suggested that the enumerated conduct was the only basis for dismissal, and the rules were consistent with a termination-at-will policy. Thus, we find no evidence from which a reasonable promisee could find a promise of job security. Consequently, we find no evidence from which reasonable minds could find that there was mutual assent on a term of employment terminable only for cause.
 
 
 23
 Rowe, 473 N.W.2d at 275. We likewise find that the handbook does not create a jury question as to whether the plaintiffs could be terminated only for cause.
 
 
 24
 Finally, even if the handbook had created a just cause contract, the plaintiffs' violation of the drug-free workplace policy would constitute cause under the rules laid down in the handbook. The handbook expressly barred drug use on the job. In July 1989, Eagle-Picher toughened the policy to prohibit an employee from reporting to work with drugs in his or her system and to require submission to testing. Although Eagle-Picher did not include this new policy in a revised handbook until three days before the surprise screening, the plaintiffs had adequate notice, as the policy had been prominently posted for nearly a month. Since Eagle-Picher clearly regarded violations of its drug policy as serious offenses, the provision in the handbook for discharge without warning applied. Therefore, we find that the plaintiffs could have been discharged even if the handbook had created a just cause employment contract. Accordingly, we affirm the district court's grant of summary judgment against the plaintiffs' breach of contract claim.
 
 B.
 
 25
 The plaintiffs next argue that the district court erred by granting summary judgment against the defamation count. We affirm, finding no genuine issue as to whether Aslanian's remarks to the media defamed any of the plaintiffs.
 
 
 26
 The plaintiffs' defamation claim is based on one statement by Aslanian that appeared in a local newspaper:
 
 
 27
 Some employees gave up their jobs rather than be tested. Aslanian said he told the employees just before the testing began, "If you know you are an illegal drug user and feel you are going to be caught you have the option to leave the plant in a few moments and we will accept that as a voluntary quit."The Leader and the Kalkaskian, August 24, 1989, at 15. Aslanian did not identify any of the plaintiffs by name. The plaintiffs argue that this statement implies that those who refused the test were illegal drug users.
 
 
 28
 A statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Nuyen v. Slater, 372 Mich. 654, 127 N.W.2d 369, 374 n. * (1964). An accusation of a commission of a crime is defamatory per se. Wilkerson v. Carlo, 101 Mich.App. 629, 300 N.W.2d 658, 659 (1980).
 
 
 29
 The district court found that Aslanian's remarks "could be considered defamatory to plaintiffs as a group," but held that the remarks were protected by a qualified privilege. Baggs, 750 F.Supp. at 270. Although we have reservations as to whether Aslanian enjoyed a qualified privilege, we affirm the summary judgment on the alternative ground that the comments are not defamatory.
 
 
 30
 We begin our analysis of Aslanian's remarks by noting that he did not state that all those refusing the test were drug users. Instead, the statement points out that employees were told they could refuse the test. The statement does not exclude the possibility that some employees refused the test for reasons other than fear of being caught. It is the plaintiffs who have supplied the missing implication: that all those refusing the test were illegal drug users. While we agree that some people might assume that anyone refusing a drug test must have something to hide, we fail to see how Aslanian's published comments added to this possible misconception.
 
 
 31
 "Where the words are, as a matter of law, not capable of carrying a defamatory meaning, summary judgment ... is appropriate." Sawabini v. Desenberg, 143 Mich.App. 373, 372 N.W.2d 559, 563 (1985). Since we find that Aslanian's comments could not be reasonably read to state that those refusing the test were illegal drug users, we affirm the grant of summary judgment against the plaintiffs' defamation claim.
 
 
 32
 Finally, we note that even if Aslanian had stated that all of the plaintiffs who refused the test used illegal drugs, most of them still could not recover. Of the ten plaintiffs who refused to submit to testing, eight have admitted to using illegal drugs. Since truth is a complete defense to an action for defamation, those eight plaintiffs could not prevail. See Cochrane v. Wittbold, 359 Mich. 402, 102 N.W.2d 459, 463 (1960).
 
 C.
 
 33
 The plaintiffs next argue that the district court erred in granting summary judgment against their invasion of privacy claim. We disagree.
 
 
 34
 Michigan law has long recognized a common-law right to privacy. See De May v. Roberts, 46 Mich. 160, 9 N.W. 146 (1881) (affirming judgment against physician who allowed young male companion to watch plaintiff give birth). Michigan courts recognize four distinct common-law privacy torts: (1) intrusion into a person's seclusion, solitude, or private affairs; (2) public disclosure of embarrassing private facts about a person; (3) publicity that portrays a person in a false light; and (4) appropriation for gain of a person's image or likeness. Lewis v. Dayton-Hudson, 128 Mich.App. 165, 339 N.W.2d 857, 858 (1983); Beaumont v. Brown, 401 Mich. 80, 257 N.W.2d 522, 527 n. 10 (1977).
 
 
 35
 The plaintiffs allege that Eagle-Picher's conduct constituted intrusion into the plaintiffs' seclusion. To prevail on this claim, the plaintiffs "must show that there was: (1) an intrusion by defendant; (2) into a matter which plaintiff[s] [have] a right to keep private; (3) by the use of a method which is objectionable to the reasonable person." Lewis, 339 N.W.2d at 859 (citing Earp v. City of Detroit, 16 Mich.App. 271, 167 N.W.2d 841, 845 (1969)).
 
 
 36
 The Michigan courts have not decided whether drug testing of private-sector employees amounts to a tortious invasion of privacy. Therefore, we must examine privacy cases involving other intrusions in order to decide whether the plaintiffs' allegations would survive summary judgment in a Michigan court.[2]
 
 
 37
 Workplace urine testing represents an intrusion that a reasonable person might find objectionable. In a case challenging federal regulations requiring urinalysis of certain railway workers, the United States Supreme Court stated:
 
 
 38
 [C]hemical analysis of urine ... can reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant, or diabetic. Nor can it be disputed that the process of collecting the sample to be tested, which may in some cases involve visual or aural monitoring of the act of urination, itself implicates privacy interests. As the Court of Appeals for the Fifth Circuit has stated:
 
 
 39
 "There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom." National Treasury Employees Union v. Von Raab, 816 F.2d 170, 175 (1987).
 
 
 40
 Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment.
 
 
 41
 Skinner v. Railway Labor Executives Ass'n, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) (footnote omitted). The Court upheld the challenged regulation, however, finding that mandatory urinalysis of workers in certain circumstances is not unreasonable. Id. at 634, 109 S.Ct. at 1422.
 
 
 42
 The Michigan Court of Appeals has held that a plaintiff may recover for an intrusion into his or her solitude when performing eliminatory functions. Harkey v. Abate, 131 Mich.App. 177, 346 N.W.2d 74 (1983). In Harkey, the court reversed a grant of summary judgment to the owner of a roller-skating rink who had installed see-through panels in a restroom, finding that this type of intrusion was highly offensive to a reasonable person. Id., 346 N.W.2d at 76.
 
 
 43
 Although mandatory workplace urine testing may well be an intrusion that a reasonable person would find objectionable, our inquiry does not end there. The plaintiffs also must show that Eagle-Picher intruded into a matter that the plaintiffs had a right to keep private.
 
 
 44
 The Michigan Court of Appeals has twice held that the relationship between the parties affects the right of a plaintiff to keep certain matters private. In Earp, the court stated that the right of privacy "does not extend so far as to subvert those rights which spring from social conditions, including business relations...." Id., 167 N.W.2d at 845 (citing 77 C.J.S. Right of Privacy § 3 at 401). The court affirmed summary judgment in favor of an employer who had obtained a copy of a confidential police report of an interview with an employee. The court held that the employee had no privacy right to keep the employer from obtaining the report because the interview concerned company business and because the employee had told the employer about the interview. Id. at 848.
 
 
 45
 More recently, the Michigan Court of Appeals affirmed a summary judgment for an employer who had undertaken extensive surveillance of an injured employee's home to determine if he was malingering. Saldana v. Kelsey-Hayes Co., 178 Mich.App. 230, 443 N.W.2d 382 (1989). The court conceded that the employer's use of a high-powered lens to observe the interior of the employee's home could be objectionable to a reasonable person. Id., 443 N.W.2d at 384. The court found, however, that the intrusion was not into a matter the employee had a right to keep private because the employer had a right to investigate the extent of the employee's disability. Id.
 
 
 46
 Saldana and Earp compel us to conclude that Eagle-Picher's conduct did not invade a matter that the plaintiffs had a right to keep private under Michigan law. Both of those cases stand for the proposition that a Michigan employer may use intrusive and even objectionable means to obtain employment-related information about an employee. There is no dispute that the information Eagle-Picher sought, whether employees were reporting to work with drugs in their systems, was related to the plaintiffs' employment. Therefore, even accepting the plaintiffs' contention that Eagle-Picher's urine testing program may have been intrusive and objectionable to a reasonable person, summary judgment is still appropriate.
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 Eagle-Picher used three versions of its application forms, each containing slightly different language. All three versions, however, provided for termination without cause or notice
 
 
 [2]
 Although employee drug testing has been heavily litigated, most cases have not involved the common-law privacy tort. Drug testing of public-sector employees invokes the Fourth Amendment. See, e.g., National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); Penny v. Kennedy, 915 F.2d 1065 (6th Cir.1990). Other cases have turned on privacy provisions in state constitutions, e.g., Luck v. Southern Pac. Transp. Co., 218 Cal.App.3d 1, 267 Cal.Rptr. 618, cert. denied, --- U.S. ----, 111 S.Ct. 344, 112 L.Ed.2d 309 (1990), or state public policy, e.g., Twigg v. Hercules Corp., 406 S.E.2d 52 (W.Va.1990). Since the plaintiffs in this case were private-sector employees, they cannot invoke the Fourth Amendment or the privacy provision of the Michigan Constitution. The plaintiffs do not advance a public policy claim on appeal. The state courts that have considered common-law privacy challenges to employee drug testing have upheld the testing programs. Luedtke v. Nabors Alaska Drilling, Inc., 768 P.2d 1123, 1137-38 (Alaska 1989); Jennings v. Minco Technology Labs, Inc., 765 S.W.2d 497, 502 (Tex.Ct.App.1989); Texas Employment Comm'n v. Hughes Drilling Fluids, Inc., 746 S.W.2d 796, 801-02 (Tex.Ct.App.1988)